# SLIDE AND SPUR GOLD MINES *v.* SEYMOUR.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 284.   Argued March 15, 1894. — Decided May 14, 1894.

The courts of the United States enforce vendor's and grantor's liens, if in harmony with the jurisprudence of the State in which the action is brought.

It being conceded that a vendor's lien is recognized in Colorado, such a lien will be recognized and enforced in a Federal court in that District.

On the contracts in this case, set forth in the opinion of the court, and the circumstances attending the making of them as therein detailed, this court holds that the plaintiffs below retained a vendor's lien upon their mining property in Colorado which they conveyed to the defendants below, and affirm the decree of the court below to that effect.

THE facts in this case are as follows: In and prior to the month of October, 1886, the plaintiffs below, Ellen R. Seymour and William G. Pell, were the owners of certain mining prop-

erty in the Gold Hill mining district, Boulder County, Colorado, known as the "Slide and Spur lodes." There had been some negotiations with one John Haldeman, with the view to a sale of this property, and on October 19, 1886, the plaintiffs, by their agents, made the following proposition to him:

"DEAR SIR: I agree that in case you cannot raise the required sum within the specified time in your contract, dated about the 9th day of October, between W. F. Bruff, acting under our authority, and yourself, to change the conditions as follows, viz.: To sell you the Slide mine for $750,000; 25 (M) thousand dollars to be paid one week after the receipt in London of Foster's report, this to be the first payment on the property, the balance of the purchase price, $725,000, to be paid within two months from the date of the payment of $25 M; one ½ in cash and one-half in fully-paid common shares of the company to be formed. In case the second and last payment is not made when due, the agreement cancels itself, and the $25 M is forfeited. No ore to be taken from the mine after first payment. I further agree to give you a call at par for two months from date of issue upon the shares received as part payment for the property.

"(Signed)       J. F. SEYMOUR.
"A. B. DAVIS."

Thereafter said Haldeman, in accordance with the understanding at the time of giving this option, went to England and secured the organization, under the laws of Great Britain, of the defendant corporation. The purpose for which this corporation was organized was, as expressly stated, to purchase and develop the "Slide and Spur mines," though the articles of incorporation gave authority for the purchase and development of other properties. So far, however, as appears from the testimony in this case it was simply an organization on paper, with a view of acquiring title to and subsequently working these mines.

The provision in its charter as to capital stock was as follows:

"The capital of the company is 400,000 pounds, divided into four hundred thousand shares of 1 pound each, the whole or any portion of which and any future capital of the company may be issued as full or partly paid shares and at a discount or premium and with the benefit of any preference or priority in the distribution of assets or payment of dividends, and with power also to increase or decrease such capital stock and to issue any part or parts of the increased or decreased capital as consolidated stock or any shares at such times, in such manner, and on such terms as the company shall determine."

The organization of this corporation was completed on the 24th of May, 1887. On August 18, 1887, Haldeman having theretofore made partial payments to the plaintiffs, an agreement was entered into between himself and J. Fenton Seymour, as their agent, which agreement was as follows:

"Memorandum of agreement made this 18th day of August, 1887, between John Haldeman, of 38 Old Jewry, in the city of London, and J. Fenton Seymour, of Denver, Colorado, in the United States of America, acting for himself and partners, the owners of the Slide and Spur gold mines, situate in Boulder County, Colorado, United States of America:

"The said John Haldeman agrees to pay forthwith the sum of ten thousand pounds sterling in addition to twelve thousand five hundred pounds already paid on account of the purchase money of the said mines, such sum of ten thousand pounds to be paid through Messrs. Wells, Fargo & Co., (who now hold the deeds of the said property in escrow,) and to be held by them and paid over to the said J. Fenton Seymour upon the titles of the said mines being registered in the name of the 'Slide and Spur gold mines,' limited, free from all charges and encumbrances; and the said J. Fenton Seymour hereby undertakes and agrees to register the titles as above upon the said ten thousand pounds being deposited with Messrs. Wells, Fargo & Co.

"The said J. Fenton Seymour hereby undertakes and agrees to have the 'Slide mine' worked to its full capacity, and after the due and legal registration of the title to the

said company he further agrees that the returns from the said mine shall be cabled weekly to the said company in the form of cables sent herewith, it being understood and agreed that the money value of the first weekly returns so cabled shall not be less than the sum of two hundred pounds sterling, and that each successive weekly return shall show a moderate increase over that sum.

" The said J. Fenton Seymour hereby undertakes and agrees to take the control of the management of the said property until the payments hereinafter mentioned are completed, and it is understood and agreed that he shall retain such control until the said payments are completed. The said John Haldeman agrees that three hundred and seventy-five thousand shares of one pound each in the above company shall be transferred to Mr. Clarence Preston Elder as trustee and deposited with Messrs. Wells, Fargo & Co. in London, to the intent that the said shares shall be held as security for the due performance of the following conditions, viz. :

" 1st. The payment of ten thousand pounds, in addition to the above-mentioned twenty-two thousand (J. F. S.) five hundred pounds within three days (J. F. S.) after the receipt of the third successive weekly return from the mine, as hereinbefore mentioned ; and,

" 2d. The balance of forty-five thousand pounds at the expiration of ten days after the receipt of eight successive weekly returns of the nature and value above specified. Upon the completion of the above-mentioned payments the said J. Fenton Seymour hereby undertakes and agrees to release the above-mentioned three hundred and seventy-five thousand shares, less seventy-seven thousand five hundred, to which he is entitled, and also less the number of shares sold with the consent and under the supervision of the aforesaid Clarence Preston Elder, acting for the said J. Fenton Seymour.

" In case the weekly returns cabled from the mine shall from any cause fall below the sum of two hundred pounds sterling per week, then, in that case, such returns shall not count, but the time for paying the second ten thousand pounds and the balance of forty-five thousand pounds shall

be extended *pro rata;* but should the successive weekly re-turns amount to two hundred pounds sterling per week, (J F. S.,) with a moderate increase weekly, as hereinbefore mentioned, and the said John Haldeman shall make default in the payment of the balance of forty-five thousand pounds, then in that case, the said J. Fenton Seymour shall have the right to forfeit the amounts already paid and to claim the above-mentioned three hundred and seventy-five thousand shares.

"As witness the hands of the said parties the day and date first above written.

"(Signed)        J. FENTON SEYMOUR.

"JNO. HALDEMAN."

Subsequently there were some further payments. On October 5, 1888, the larger portion of the purchase money still remaining unpaid, the plaintiffs, through their agent, J. Fenton Seymour, made to the company this proposition:

"1st. On payment of 3500 pounds to Wells, Fargo & Co., we agree to start the mine at work in name of Co., said sum to cr. of Col. Seymour.

"2d. Company to send cashier and engineer (if they think fit) & Col. Seymour to be resident manager and director for the period of one year.

"3d. All proceeds to be transmitted to company bankers.

"4th. Mr. Elder to deliver 75,000 shares to the Scotch subscribers and 45,000 to Mr. Rust on payment of said sum.

"5th. The balance of shares to remain in Mr. Elder's hands, as trustee, until a final settlement can be made, inside of three months after acceptance of this proposition.

"6th. Col. Wilson, or whoever pays the £3500, to receive 15,000 shares from Mr. Elder on the final settlement, (not later than three months,) and meantime receive a legal obligation from Mr. Elder as trustee.

"7th. On resignation of Mr. Elder as a director, Mr. Allen to be elected.

"8th. £3500 to be paid so soon as the company can register the transfer of the 75,000 shares.

"(Signed)        J. F. SEYMOUR."

This proposition was accepted and the thirty-five hundred pounds mentioned in the first clause were paid on December 15, 1888. In pursuance of the agreement of August 18, 1887, the plaintiffs delivered to the defendant a deed for the property, which deed was duly recorded in the office of the recorder of Boulder County on September 16, 1887. A large portion of the purchase money still remaining unpaid, on February 16, 1889, the plaintiffs filed their bill in the Circuit Court of the United States for the District of Colorado, in which bill they prayed for an accounting, that the amount of purchase money found due be adjudged a lien upon the property, and that such lien be foreclosed and a sale ordered.

The defendants answered, proofs were taken, and on July 8, 1890, a decree was entered finding the amount of the unpaid purchase money to be $250,800, decreeing it a lien upon the property, and ordering a foreclosure and sale. From such decree the defendant appealed to this court.

*Mr. Harvey Riddell* for appellant.

The circumstances surrounding this transaction and sale show that the appellees waived or abandoned any right to a vendor's lien.

I. The objects, purposes and ends for which the sale was made are inconsistent with the intention to retain such lien. *Gilman* v. *Brown*, 1 Mason, 191, 204, 218. When lands are conveyed to enable the purchaser to raise money thereon by mortgage for the purpose of paying the purchase money, the lien is abandoned. *Clower* v. *Rawlings*, 9 Sm. & Marsh. 122; *S. C.* 47 Am. Dec. 108; *Strong* v. *Strong*, 126 Illinois, 301; *Springfield &c. Railroad* v. *Stewart*, 51 Arkansas, 285. See also *Fisk* v. *Potter*, 2 Abb. (N. Y.) App. 138; *S. C.* 2 Keyes, 64; *McGonigal* v. *Plummer*, 30 Maryland, 422; *Cordova* v. *Hood*, 17 Wall. 1; *Fisher* v. *Shropshire*, 147 U. S. 133; *In re Brentwood Brick & Coal Co.*, 4 Ch. D. 562; *Kettlewell* v. *Watson*, 21 Ch. D. 685, 703; *S. C.* on appeal, 26 Ch. D. 501.

II. The contract of August 18 and 19 expressly says that the stock was taken and held in trust "to the intent that the said shares shall be held as security for the due performance" of

the conditions of the contract as to making deferred payments; that said shares were to be issued by the company to Haldeman "in payment in full for said mines against a clean transfer of the property to the company, free of all encumbrances and liabilities whatsoever, and the due registration of said transfer, and which shares are immediately, upon the same being so issued to be transferred to the said Clarence Preston Elder, . . . as trustee for behoof of all concerned, and the said shares are to be then deposited with Wells, Fargo & Co. . . . in the name of . . . Elder, as a guaranty for the fulfilment by the said John Haldeman of the terms of said agreement so far as incumbent upon him, as fully set forth in the said agreement."

The bill itself virtually contains the same allegations, but seeks to escape the effect thereof by alleging that the sale was made to the company.

But, leaving out of consideration the deductions to be drawn from the subsequent forfeiture of the pledged stock, or, if such forfeiture be denied, the subsequent dealings of Seymour with such stock, the evidence is very clear that it was taken as security.

Taking collateral security, unless the merely personal obligation of the vendee, which is construed as a means of payment, is a waiver of a vendor's lien. *Brown* v. *Gilman*, 4 Wheat. 255; *S. C.* 1 Mason 191; *Cordova* v. *Hood*, 17 Wall. 1; *Chilton* v. *Braiden*, 2 Black, 458; *Fisher* v. *Shropshire*, 147 U. S. 133; *Marshall* v. *Christmas*, 3 Humph. 616; *S. C.* 39 Am. Dec. 99; *Kauffelt* v. *Bower*, 7 S. & R. 64; *Clower* v. *Rawlings*, 9 Sm. & Marsh. 122; *S. C.* 47 Am. Dec. 108; *Coos Bay Wagon Co.* v. *Crocker*, 4 Fed. Rep. 577; *Dudley* v. *Dickson*, 14 N. J. Eq. 252; *Selby* v. *Stanley*, 4 Minnesota, 65; *Young* v. *Wood*, 11 B. Mon. 123; *Stuart* v. *Harrison*, 52 Iowa, 511; *Kyle* v. *Bellenger*, 79 Alabama, 516; *Strong* v. *Strong*, 126 Illinois, 301; *Crans* v. *Hamilton County*, 87 Indiana, 162; *Fish* v. *Howland*, 1 Paige, 20; *Ilett* v. *Collins*, 103 Illinois, 74; *Nairn* v. *Prowse*, 6 Ves. Jr. 752; *McGonigal* v. *Plummer*, 30 Maryland, 422; *Francis* v. *Wells*, 2 Colorado, 660; *Richards* v. *McPherson*, 75 Indiana, 158.

III. We contend, also, that appellees are estopped from asserting a vendor's lien. The following cases, heretofore cited, are in point: *Strong* v. *Strong*, 126 Illinois, 301; *Fisk* v. *Potter*, 2 Abb. (N. Y.) App. 138 (*S. C.* 2 Keyes, 64); *McGonigal* v. *Plummer*, 30 Maryland, 422, where it was said that since the lien is "the mere creation of a court of equity, existing in the nature of a secret trust, it should not, for that reason, be implied and maintained, where it would operate as a means of deception, or in prejudice of good faith."

Appellees certainly agreed that a deed should be delivered and the title conveyed free and clear of all incumbrance whatsoever — free and clear to the full extent that the stock might be put upon the market without any latent liens whatsoever, and that the company might issue 375,000 shares of fully paid up stock in full payment therefor, and they would look to the stock for payment under a pledge thereof.

It is certain that the company, as well as all other parties in interest, so understood it. It would be to allow appellees to entrap the directors into the commission of a fraud, as well as to a subjection to a penal statute, to hold that the stock might be issued under the circumstances disclosed in this case, and then that appellees might still assert a vendor's lien.

*Mr. Willard Teller* for appellees.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

It is conceded that a vendor's lien is recognized in Colorado, *Francis* v. *Wells*, 2 Colorado, 660, and such a lien, therefore, will be recognized and enforced in a Federal court. As said in *Fisher* v. *Shropshire*, 147 U. S. 133, 139: "The courts of the United States enforce grantor's and vendor's liens if in harmony with the jurisprudence of the State in which the action is brought, and the principle upon which such a lien rests has been held to be that one who gets the estate of another ought not in conscience to be allowed to keep it without paying the consideration. *Chilton* v. *Braiden's Administratrix*, 2 Black, 458; Story's Eq. Jur. § 1219."

Such a lien is one which appeals strongly to the favorable consideration of a court of equity. In *Baum* v. *Grigsby,* 21 California, 172, 176, it was declared to be a right not arising from any agreement of the parties, but a creature of equity, "founded upon the natural justice of allowing a party to reach the property which he has transferred to satisfy the debt which constitutes the consideration of the transfer." So, in *Refeld* v. *Woodfolk,* 22 How. 318, 327, this court said: "A court of chancery regards the transfer of real property in a contract of sale and the payment of the price as correlative obligations. The one is the consideration of the other; and, the one failing, leaves the other without a cause." An intent to abandon it is not to be presumed, and while, of course, like any other right, it may be abandoned or waived, the evidence of an intent to so abandon or waive should be clear and satisfactory. 2 Story's Eq. Jur. § 1226, and cases cited in notes. In *Cordova* v. *Hood,* 17 Wall. 1, it was held that while the taking of security may raise a presumption of a waiver of the lien, it is a presumption which is open to rebuttal. In 2 Story's Eq. Jur. § 1224, the author says that "if, under all the circumstances, it (the waiver) remains in doubt, then the lien attaches." And in the case of *Fisher* v. *Shropshire, supra,* the Chief Justice observed: "Undoubtedly, a lien of the character we are considering may be defeated if the grantor or vendor do any act manifesting an intention not to rely on the land for security; but this must be an act substantially inconsistent with the continued existence of the lien, and cannot be inferred from the mere fact that the parties may not have contemplated the assertion of the lien in the first instance."

There is nothing in the cases cited from the English courts inconsistent with the authorities heretofore cited, or questioning the general rule therein laid down in respect to a waiver of vendor's lien. The case *In re Brentwood Brick and Coal Company,* 4 Ch. D. 562, 565, was one in which the property was transferred to a corporation, not for a fixed sum to be paid absolutely, but, as stated, thus: "Fifty per cent of all sum or sums of money received, or to be received, by the

company on the sale of its shares, and the like sum of fifty per cent upon all money by way of capital to be at any time borrowed by the company until the payments so made " should amount to the sum of 6000 pounds. It was held that the vendor had waived his lien. James, L. J., saying: " I am of opinion that the order of the Vice Chancellor must be affirmed. The case of the appellant may be a hard one, but the nature of the transaction excludes vendor's lien. This is not the case of a simple agreement to sell for £6000. No doubt the vendor got a higher price by agreeing to accept payment in the way he did, and taking his chance of capital being subscribed or capital being borrowed to an amount sufficient to pay him. He says in fact, ' half of the first capital moneys that come in to the extent of £6000 is to be my purchase money.' No day for payment was named; he agreed to receive his purchase money if and when capital should come in. He got for his property a charge upon and a right to the capital of the company to the extent of £6000 when it came in. To my mind it is clear that he intended to rely on that fund for payment, and intended that the company should have the means of borrowing. This is quite inconsistent with a lien which would probably make the company unable to pledge their property. I am, therefore, of opinion that the Vice Chancellor came to a correct conclusion." And Baggallay, J. A., adding: " I think it is evident that the party selling did not intend to rely on the security of the estate but on the funds of the company." In *Kettlewell* v. *Watson*, 21 Ch. D. 685; on appeal, 26 Ch. D. 501, 510; the appellate court held, while recognizing the general rule that the vendor has a lien for his purchase money, that the circumstances disclosed a knowledge on the part of the vendors or their agent that the vendees sought a registry of the deed of conveyance for the purpose of subdividing the property and selling it in lots, and with that knowledge assented to such registry, and also knowledge that the vendees were selling lots, and hence that they should not be permitted to assert a lien as against the *bona fide* purchasers of such lots, who had paid full price therefor to the vendees. The decision was rested on the doctrine

of estoppel, the court saying : " In our opinion the conduct of Dibb (plaintiffs' agent) induced purchasers of the portions of the estate sold reasonably to believe that Richardson & Watson [the vendees] had power to deal with the estate as absolute owners free from the lien now insisted on ; and as he so acted, the plaintiffs, who left everything to him, cannot, in our opinion, assert their lien against lots purchased without notice that the trustees desired to insist on their lien even though such purchasers have an equitable title only."

It is not questioned in this case that a large part of the money consideration for the sale of these mines remains still unpaid, and the defendant is in the attitude of one who, admitting that the vendors have not received the money for which he sold the land, nevertheless insists upon retaining the property discharged of any obligation for its payment. Its contention is that the plaintiffs sold to Haldeman and that Haldeman sold to it, and that inasmuch as the terms of the original proposition of October 19, 1886, were not complied with, a new agreement was made on August 18, 1887, by which the plaintiffs were to pass a title " free from all charges and incumbrances," and to rely for their security upon a portion of the stock of the grantee deposited with one of its directors. But the provision that the property should be free from charges and incumbrances obviously refers to prior charges and incumbrances, and does not exclude any which arise out of the conveyance itself.   It means simply that the grantors shall have removed all burdens which rested upon the property prior to the time of making their deed, and that that deed shall pass the title perfect and unencumbered, but not that the grantee shall take it free from all obligation of payment or discharged from the lien for the purchase price which rests upon real estate until such price is paid.   The language of the covenants in the deed is in harmony with this thought ; for, after the covenant of seizin and of the right to sell, follows one that the premises " are free and clear from all former and other grants, bargains, sales, liens, taxes, assessments, and incumbrances of whatever kind or nature soever."   It will be noticed that this agreement was not be-

tween the grantors and grantee, but between the grantors and a third party who was seeking to accomplish, with profit to himself, a sale from the plaintiffs to the defendant at the price they demanded, and who was seeking to utilize the stock of the defendant in securing money for the cash part of the consideration. There is no presumption from the delivery of the deed that the plaintiffs intended to waive their lien for the purchase money. Indeed, it is characteristic of a vendor's lien, as distinguished from a contract lien, that it arises upon a transfer of title. It is a doctrine of equitable jurisprudence which says that land, which is immovable, is the best security for its own price, and that title thereto should therefore pass subject to the equitable burden of such security. The actual conveyance of the title to the company was not for the interest or the benefit of the plaintiffs. They were not thereby placed in any better position or given any new advantage. It is said that the agreement in terms provides that 375,000 out of 400,000 shares of stock in the defendant company shall be transferred to one of its directors, as trustee for the plaintiffs, and held as security for the payment to them of the unpaid purchase money; but the obligation of the company, its duty to pay, an obligation and a duty resting upon it as the representative of all its shares of stock, are clearly of more value than the security obtained by the deposit of a portion of its shares. For, in the one case, even if there were no personal liability of the stockholders, the promise of the company could be enforced to the extent of the appropriation of all of its property, and thus the exhaustion of the value of all its shares, while in the other the transfer of a portion of its shares of stock would enable the vendor in case of a failure of payment to obtain relief, not to the full extent of the property owned by the corporation, but only to that fractional portion thereof, represented by the number of such shares. It must be borne in mind that this corporation had no other properties than these mines. It had a nominal capital stock of 400,000 pounds, with authority, apparently, to increase it without limit; yet this thing of paper contends that it bought of Haldeman

these valuable mining properties upon the sole consideration of $\frac{15}{16}$ths of its shares of stock, and that the plaintiffs sold to Haldeman, and intended by their agreement and conveyance to part absolutely with the title, to abandon every lien, and trust for the payment of the purchase money entirely to the security of these shares, transferred to one of the directors of the corporation. It will be perceived that at first there was not even this security, for the agreement provides for the registry of the title not upon the issue, transfer, and deposit of the shares; but upon the deposit with Wells, Fargo & Co. of 10,000 pounds. Is it to be supposed that they delivered the deed upon the deposit of that money to their credit, and, waiving all lien upon the property, were relying alone upon the promise of Haldeman to obtain from the company (their vendee) the issue of 375,000 shares, and to then make transfer to Elder and deposit with Wells, Fargo & Co. ? If there had been no stipulation in respect to the control of the property it would be difficult to sustain the contention that the provision for the transfer and deposit of a portion of the shares of the company was sufficient evidence of an intent to abandon the vendor's lien. But the agreement furnishes direct evidence to the contrary. It is made by J. Fenton Seymour, "acting for himself and partners, the owners" of the property, (the plaintiffs in this case,) and contains this clause: "The said J. Fenton Seymour hereby undertakes and agrees to take the control of the management of the said property until the payments hereinafter mentioned are completed, and it is understood and agreed that he shall retain such control until the said payments are completed." This negatives the idea that the plaintiffs were relying for the payment of the unpaid purchase money solely upon the security of these shares of stock. It is an express affirmation that their dominion over the property is not to cease until the purchase money is all paid. It thus makes the property itself the security for the price. In the face of this stipulation it would require very cogent testimony to convince any, one that the plaintiffs had abandoned all lien upon the property itself, and were resting alone upon the security of the shares.

There is no such testimony; nothing which makes against this express purpose of the plaintiffs to retain control of the property until the purchase price was paid.

The transaction with what is called in the record the Scotch syndicate does not seem to us to have the significance which counsel contends, and this notwithstanding the recitals in the agreement respecting it. That transaction was this: The 10,000 pounds which, by the agreement of August 18, 1887, Haldeman was to pay immediately, were advanced by that syndicate, and on the 19th of August, the day after the contract between Haldeman and Seymour, Seymour entered into an agreement with the representatives of the syndicate that 75,000 of the 375,000 shares should be held for its benefit. This, instead of supporting defendant's contention, tends to show that the plaintiffs were not relying upon these shares as their security, but, having a lien upon the property itself, were willing that Haldeman, or the corporation, should use the shares for the purpose of securing money with which to make payment. And while there is in the agreement signed by J. Fenton Seymour a recital which, to some extent, makes against the claim of the plaintiffs in that it states that by the agreement of August 18 the company was to issue to John Haldeman 375,000 fully paid up shares "in payment in full for the said mines against a clean transfer of the property to the company free of all incumbrances and liabilities whatsoever," yet that recital is qualified by that which follows immediately thereafter, to the effect that the shares are "to be transferred to the said Clarence P. Elder, a director of the company, as trustee for behoof of all concerned," and also to be deposited with Wells, Fargo & Co. "as a guarantee for the fulfilment by the said John Haldeman of the terms of said agreement so far as incumbent upon him, all as fully set forth in the said agreement."

These last words refer to the agreement of August 18 as disclosing fully the agreement between the plaintiffs, Haldeman, and the defendant. Evidently there was no thought in this of enlarging the scope or adding to the significance of that agreement. If it be said that here is an interpretation by the

parties of its meaning, it will be seen that all that it asserts is that the corporation transfers to Haldeman the shares in full payment for the property. Or, in other words, that it leaves to him the perfecting of the title free from incumbrances, and in consideration therefor issues the 375,000 shares. It contains no assertion, directly or by implication, that the plaintiffs either take these shares in payment or accept them as the only security for payment. It recites that they are transferred to the trustee, not for the plaintiffs, but for behoof of all concerned, thus plainly implying that they are to be used by Haldeman with the assent of the plaintiffs as a means of obtaining money for the purpose of completing the payment to them; but there is in none of these recitals, either in terms or by fair implication, an agreement or a statement on the part of the plaintiffs that they forego their vendor's lien, and that they intend to look thereafter simply to those shares and to the good faith of the trustee and the depositary for the payment of the purchase price. There surely is in all this nothing to convince that the plaintiffs intended to abandon the lien upon the property which existed when they executed the deed to the company and which the agreement for a retention of control by their agent directly asserted.

We see, therefore, no reason to question the conclusions reached by the Circuit Court, and its decree is

*Affirmed.*