[Civ. No. 514. Fifth Dist. Nov. 23, 1965.]

A. J. McGREEVY et al., Plaintiffs and Respondents, v. CONSTITUTION LIFE INSURANCE COMPANY et al., Defendants and Appellants.

Robert A. Eaton for Defendants and Appellants.

William H. Colvin and Robert M. Aran for Plaintiffs and Respondents.

CONLEY, P. J.—The respondents secured a judgment against The Southwest Foundation in the principal sum of $225,000, representing the unpaid balance of the sale price of oil and gas leases in the Deer Creek field in Tulare County, and for the foreclosure of the vendor's lien thereon. Defendants, The Southwest Foundation and Ward B. Blodget, did not appeal, and the judgment is final as to them. A default judgment was entered as against Arthur M. Hoffeins and C. L. Little as to any priority interest possessed by them by virtue of a second trust deed covering the real property, and it also has become final. The defendants, Constitution Life Insurance Company, a corporation, and Paul Doolen, beneficiaries of encumbrances placed on the real property when title was in The Southwest Foundation, are the only appellants. In essence, the question to be decided on the appeal is whether the liens of Constitution Life Insurance Company and Paul Doolen have a preferred position as against a vendor's lien of the original sellers.

Respondents were members of two partnerships known as McGreevy-Neary Co. No. 1 and McGreevy-Neary Co. No. 2; the surviving general partners were A. J. McGreevy, A. F. Peterson, C. E. Ralph; the other plaintiffs are either the heir and successor of a former general partner (Lottie E. Neary, widow of F. E. Neary), or limited partners. These partnerships owned valuable oil and gas leases in the Deer Creek Oil Field; they had discovered oil in that location, and had brought in approximately nine producing wells. On September 12, 1956, the partners, after granting several options which had expired, entered into an agreement to sell their interest to Ward B. Blodget, a licensed oil broker. The consideration for the sale was specified therein as follows:

(a) $79,000 cash, out of which $54,000, plus interest, was to be paid to the Security First National Bank of Los An-

geles, to satisfy an indebtedness incurred by respondents in development of the property;

(b) A promissory note for $25,000 payable six months from the date of agreement;

(c) $200,000 secured by a contract guaranteeing payment of said sum out of 25 per cent of the net oil produced;

(d) A contract guaranteeing delivery within 12 months of as many shares of registered stock of Consolidated Chollar, Gould & Savage Mining Company, as would represent $200,000 worth of equivalent stock at the first full registration offering price to the public in accordance with the underwriting agreement.

The partners deposited executed assignments of oil and gas leases with Mr. Blodget; it was provided that such assignments were not to be released or recorded until the sum of $79,000 cash had been paid and the promissory note in the sum of $25,000 had been delivered, as well as the contract guaranteeing payment of $200,000 from 25 per cent of the value of the net oil produced and the agreement promising delivery of $200,000 worth of stock of Consolidated Chollar, Gould & Savage Mining Company within 12 months.

On September 25, 1956, Mr. Blodget entered into a purchase agreement with St. Michael's College Foundation, Inc. (now The Southwest Foundation) contracting to sell said oil and gas leases to it upon the same terms and conditions set forth in the agreement between the respondents and Blodget. The respondents acknowledged that they had read the purchase agreement between Blodget and The Southwest Foundation, that they were in accord therewith, that Blodget had good merchantable title to said oil and gas leases, and could sell and assign them and that they consented to the execution of the agreement. An escrow was opened at the Union Bank & Trust Co. in Los Angeles, by Blodget and St. Michael's College Foundation, Inc. (now The Southwest Foundation), and the purchase agreement and the consent and warranty and the executed assignments of oil and gas leases were deposited in escrow.

On November 5, 1956, an amendment of escrow instructions was executed providing that the $25,000 might be released immediately to Mr. Blodget, or his order, and that the escrow should be extended to May 1, 1957. This instruction was signed by Ward B. Blodget and St. Michael's College Foundation, Inc. and approved and consented to by A. F. Peterson, C. E. Ralph, and A. J. McGreevy. It is admitted

by respondents that they received this sum from escrow.

On November 6, 1956, there was a modification of the terms of the purchase agreement which stipulated that the amount of the $200,000 worth of stock would be determined as follows:

(a) $100,000 of common stock of said corporation at a price equal to the first offering price to the public of the shares;

(b) $100,000 of common stock at a price equal to the offering price to the public, pursuant to the first full registration with the Securities and Exchange Commission.

In any event, the $200,000 worth of stock was to be delivered within 12 months from September 25, 1956. This agreement was signed by St. Michael's College Foundation, Inc. and was consented to by Ward B. Blodget, A. F. Peterson, C. E. Ralph, and A. J. McGreevy.

On or about February 20, 1957, appellant, Constitution Life Insurance Company, agreed to make a loan to The Southwest Foundation in the sum of $250,000 and an escrow was set up at the Union Bank & Trust Co., Los Angeles, California. This loan was to be secured by a trust deed on the oil and gas leases, as well as by other collateral of The Southwest Foundation. The insurance company had engaged the services of Charles R. Thompson, attorney at law, to advise it with regard to this loan situation. Mr. Thompson was also acting as attorney for the Estate of Frank E. Neary, the deceased member of the respondent partnerships. At the same time, The Southwest Foundation also agreed to purchase stock of the Hickory Hotel corporation in Chicago for the sum of $500,000; a second trust deed on said oil and gas leases was given to Arthur M. Hoffeins as collateral, in addition to a pledge of the Hickory Hotel stock. This second trust deed was subsequently assigned to C. L. Little and Paul Doolen.

On April 2, 1957, the parties executed supplemental escrow instructions providing that Mr. Blodget should assign his interest to The Southwest Foundation in three leases only, but the remaining leases were to be assigned directly by respondents to the Foundation.

On April 5, 1957, the escrows at Union Bank & Trust Co. were closed and the assignments of said oil and gas leases, in quitclaim form, were released from escrow and recorded.

The first document recorded, after the recording of the assignments, was a notice of agreement executed by The Southwest Foundation and Ward B. Blodget and consented to by A. F. Peterson, C. E. Ralph, and A. J. McGreevy.

Respondents were not paid the sum of $25,000 evidenced by the promissory note, and have never received the $200,000 worth of stock of the Consolidated Chollar, Gould & Savage Mining Company or any other stock or other consideration in lieu thereof.

The trial court held that respondents were entitled to a judgment for $225,000 and interest and that they had an implied vendor's lien on said oil and gas leases which should be foreclosed to secure the balance of the sale price. It also determined that appellants were not encumbrancers for value, in good faith, within the meaning of section 3048 of the Civil Code, that the vendor's lien had priority over the liens of the appellants' trust deeds.

Upon the transfer of title of any real property, the seller has a vendor's lien for so much of the price as remains unpaid. (Civ. Code, § 3046.) ▆ A bona fide purchaser or encumbrancer for value takes precedence over the seller's lien. But, otherwise, the lien is good, unless it has been waived. (Civ. Code, § 3048; *Schut* v. *Doyle,* 168 Cal.App.2d 698 [336 P.2d 567]; *Finnell* v. *Finnell,* 156 Cal. 589 [105 P. 740, 134 Am.St.Rep. 143].) ▆ A waiver may be effected without the observance of any particular formality. But the burden of proof is upon any one who claims that a waiver has taken place. Any action which shows an intent by the seller to waive the vendor's lien, such as taking independent security for the payment of the balance due for the land, or entering into an agreement which shows by its terms that the seller desires to waive the lien, is sufficient to establish the right of later lien holders to rely upon their security as prior to the vendor's lien.

▆ An oil and gas lease, for a term of years and so long as oil shall be produced in paying quantities, is an interest or estate in real property; it is in the nature of a *profit à prendre,* an incorporeal hereditament. (*Estate of Broome,* 166 Cal.App.2d 488 [333 P.2d 273]; *Dabney* v. *Edwards,* 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822]; *Callahan* v. *Martin,* 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871].)

▆ In connection with the transfer of the oil leases, it was provided that the pumping units, receiving tanks, and pertinent equipment needed to produce fluid and clean oil

and dispose of excess water actually used in the field should also be transferred. The appellants take the position that as there is no such thing as a seller's lien arising from the sale of personal property alone, in a contract including both real and personal property without a segregation of the selling price for each type of property, the right to a vendor's lien no longer exists. There is dictum to this effect in *Lencioni* v. *Dan*, 128 Cal.App.2d 105, 112 [275 P.2d 101], which relies in turn upon a note in 88 A.L.R. 92 showing some difference of decision on the question in the courts of a few other states. However, *Big Sespe Oil Co.* v. *Cochran*, 276 F. 216, construing California Civil Code, section 660, holds that pumping units, receiving tanks, and other pertinent equipment needed to produce fluid and clean oil and dispose of excess water are in fact fixtures and, therefore, real property. The trial court correctly held in this case that the equipment was annexed and a part of the plant necessary for the production of oil under the leases and that respondents were, therefore, sellers of real property alone. Some of the minor items of equipment were not attached to the realty, but they were used with and essential to other equipment attached to the realty with which they constituted a unit and were, therefore, constructively annexed. (*Pajaro Valley Bank* v. *County of Santa Cruz*, 207 Cal.App.2d 621 [24 Cal.Rptr. 639].) It accords with experience and common sense to hold, as we do, that the equipment in place necessary to operate an oil lease partakes of the nature of the lease as real property in the situation disclosed by the record in this case.

■ The essential question that this court must determine from the record is whether the trial court had evidence before it which justified its conclusion that there was no intention on the part of respondents to waive their right to a vendor's lien, and that this attitude was known, or should have been known, to the appellants.

In *Finnell* v. *Finnell, supra*, 156 Cal. 589, 594-595, it is said: "It is thoroughly settled that if the vendor do any act manifesting an intention on his part not to rely on the lien thus given by law for the payment of the purchase money, such as taking security therefor, without an express agreement that he may still have his vendor's lien, the lien will not exist. (*Fisher* v. *Shropshire*, 147 U.S. 133, 143 [13 S.Ct. 201, 37 L.Ed. 109] ; *Avery* v. *Clark*, 87 Cal. 619, 625 [25 P. 919, 22 Am.St.Rep. 272] ; *Lee* v. *Murphy*, 119 Cal. 364 [15 P. 549, 955].) But the lien is presumed to exist and is an incident of

the transaction of sale in all cases unless the intention of the vendor that it *shall not exist* be clearly manifested by his acts or declarations, and the burden of proof is on the vendee or his successors to show such intention. (See 2 Jones on Liens, § 1064; *Selna* v. *Selna,* 125 Cal. 357, 360 [58 P. 16, 73 Am.St.Rep. 47].) The act manifesting such an intention must be one substantially inconsistent with the continued existence of the lien and cannot be inferred from the mere fact that the parties may not have contemplated the assertion of the lien in the first instance. (*Fisher* v. *Shropshire,* 147 U.S. 133, 143 [13 S.Ct. 201].)'' In the case of *Royal Consolidated Mining Co.* v. *Royal Consolidated etc. Co. Ltd.,* 157 Cal. 737 [110 P. 123, 137 Am.St.Rep. 165], such a waiver was found to exist and to control the question of the precedence of the vendor's lien. There the court found that the facts surrounding the sale were such as to establish an inferential waiver of the vendor's lien; the essential situation created by the acts of the sellers was that the entire plan for the sale of the mining property necessitated the borrowing of money by the buyer from a third party as an essential part of the program, and that this total plan was such as to be vitally inconsistent with any thought that the sellers would retain the priority of the vendor's lien. The basic inquiry that must be made in every case is ''What was the intention of the seller as evidenced by his actions and statements?'' In the leading case of *Slide & Spur Gold Mines* v. *Seymour,* 153 U.S. 509 [14 S.Ct. 842, 28 L.Ed. 802], an opposite conclusion was reached by the Supreme Court of the United States relative to the intention of the seller as set forth in the agreement of sale.

In the instant case, the trial court found that the appellants were not encumbrancers in good faith and for value without notice of plaintiffs' vendor's lien, and it would appear that there is ample evidence in the record, both direct and indirect, to support the conclusion of the trial court that it was never the intention of the partners to subordinate their vendor's lien to subsequent encumbrances:

1) It is apparent, from the numerous conferences among the interested parties and their attorneys and bankers before the sale occurred, and the fact that they all were people of business experience and accustomed to dealing in big figures, that the encumbrancers knew what the essential situation was with respect to the ownership and sale; in this connection, it should be remembered further that, at the time of the sale, the loan by the Constitution Life Insurance Com-

pany and the execution of a second trust deed to the predecessor of Paul Doolen, everyone thoroughly expected a satisfactory completion of the purchase by The Southwest Foundation;

2) There was a recordation of papers showing essential facts concerning the ownership of the leases and, hence, constructive notice to the lending parties of the fact that the entire consideration had not as yet been paid and that a vendor's lien was in existence;

3) Counsel for the Constitution Life Insurance Company was also attorney for the Neary estate; Mr. Neary had been one of the original partners who were owners of the oil property; Judge Thompson knew in detail of the relationship of Mr. Neary and his associates relative to the ownership and sale of the oil leases and, as he was also, at the same time, the attorney for the Constitution Life Insurance Company, the knowledge he had was legally attributable to his client;

4) The plaintiffs were in possession of the land on which the oil leases had been written, and the fact of ownership of the leases was set forth at each of the oil wells; this necessitated an inquiry by the encumbrancers, if there was any question in their minds, as to the exact status of the plaintiffs as vendors.

The trial court had ample evidence before it to decide that the respondents never abandoned their vendor's lien and that the later encumbrancers were not misled.

It is also contended largely outside the record that because there has finally been a reconveyance of the leases to the plaintiffs by the federal court in New Mexico, their vendor's lien was eliminated by merger. The briefs indicate that, while the action at bar was pending, proceedings were commenced in the federal court in New Mexico to reorganize The Southwest Foundation, pursuant to the provisions of Chapter X of the Bankruptcy Act. The federal court directed the trustee to convey the properties to respondents. It is a well-settled principle of equity that no merger of the lien with the remainder of the estate takes place where there are intervening liens such as in the present situation. When it is necessary to preserve the priority of a right, a lien is not considered merged by such a subsequent transaction, and equity will preserve the priority. (31 Cal.Jur.2d, Liens, § 33. p. 268; *Monheit* v. *Cigna*, 28 Cal.2d 19, 25 [168 P.2d 965, 167 A.L.R. 995]; 92 C.J.S., Vendor & Purchaser, § 409, p. 354.)

No intention on the part of respondents to waive the priority of their vendor's lien appears. The federal court made its order directing the conveyance to respondents, because they had been awarded a first lien on the property by the California court. Certainly, that court did not intend to reverse the state court, in effect, by awarding the properties to anyone besides the successful litigants. The point attempted to be made is without merit.

The judgment is affirmed.

Brown (R.M.), J., concurred.

Stone, J., deeming himself disqualified, did not participate.