[S. F. No. 1094.   In Bank.—December 23, 1899.]

J. J. JOHNSON, Respondent, v. CALIFORNIA LUSTRAL
COMPANY, Appellant.

MINING CORPORATIONS—DISPOSITION OF "MINING GROUND"—RATIFICATION
BY STOCKHOLDERS—CONSTRUCTION OF STATUTE.—The act of April 23,
1880, "for the further protection of stockholders in mining cor-
porations," requiring that any disposition of its "mining ground"
must be ratified by the holders of at least two-thirds of its
stock, does not import that its "mining ground" shall be subject
to mineral entry, or shall be valuable for mineral deposits in
the sense of the federal statutes relating to public lands, but
applies to any ground acquired by such corporation for mining
purposes, and subjected by it in good faith to the ordinary pro-
cess of mining with a view to utilize the product for commercial
purposes, regardless of the chemical or geological character of
the article mined, and regardless of whether the mining is at a
profit or at a loss, or whether sound judgment would or would
not approve of that use of the land.

ID.—MORTGAGE ON "PAINT-STONE" MINE—MEANING OF TERM "MINING
GROUND."—A mortgage on ground owned and mined by a mining
corporation, for rock called "lustral," or "paint-stone," which is
worked by the ordinary process of mining and pulverized in a
mill, and the product sold to be used in the manufacture of
paint, is a mortgage on "mining ground" within the meaning
of the statute, and is not valid unless ratified by the holders of
at least two-thirds of the capital stock.

ID.—STATUTE LIMITED TO "MINING GROUND."—The act of April 23, 1880,
is limited in its operation to the "mining ground" of the mining
corporation, and the appurtenances connected therewith, and
does not apply to other real property of the corporation.

APPEAL from a judgment of the Superior Court of Napa
County and from an order denying a new trial.   E. D. Ham,
Judge.

The facts are stated in the opinion of the court.

Fitzgerald & Abbott, Sam Bell McKee, and R. B. Myers, for
Appellant.

The statute applies to all mining corporations and all mining
ground, regardless of the nature or results of the mining therein,
or of the mineral substance mined, which may include salt, coal,
paint-stone, or any substance which can be got underneath the

earth, for the purpose of profit. (*Hext v. Gill*, L. R. 7 Ch. App. 699, 712; *Gesner v. Gas Co.*, 2 Allen (N. B.), 595; *Earl of Jersey v. Neath etc. Union*, L. R. 22 Q. B. Div. 555; *Midland Ry. Co. v. Haunchwood etc. Co.*, L. R. 20 Ch. Div. 552; *Loosemore v. Tiverton etc. Ry. Co.*, L. R. 22 Ch. Div. 25; *Midland Ry. Co. v. Miles*, L. R. 33 Ch. Div. 632; *Dixon v. Caledonian etc. Ry. Co.*, L. R. 5 App. Cas. 820; *Bell v. Wilson*, 1 Ch. App. 303.) "Paint-stone" may be conveyed under the terms "mines and minerals." (*Hartwell v. Camman*, 10 N. J. Eq. 128; 64 Am. Dec. 448.) "Mining ground" includes all appurtenances thereto. (*McShane v. Carter*, 80 Cal. 310.) The mortgage, being upon the mining ground of the corporation, is invalid, under the statute, because not ratified as required thereby. (*McShane v. Carter, supra; Pekin Min. Co. v. Kennedy*, 81 Cal. 363; *Alta Silver Min. Co. v. Alta Placer Min. Co.*, 78 Cal. 629.)

E. M. Gibson, and Welles Whitmore, for Respondent.

The land in question was patented as agricultural land; and the finding of the court that it is agricultural land and has no value for mineral purposes is sustained by the evidence, which cannot be reviewed by this court.

BRITT, C.—Suit to foreclose a mortgage made by defendant to secure payment of its two promissory notes, each for the sum of five thousand two hundred and thirty-six dollars, besides interest. The property mortgaged is a tract of land owned by defendant containing about one hundred and four acres. The defense is founded on the act of the legislature entitled, "An act for the further protection of stockholders in mining companies," approved April 23, 1880 (Stats. 1880, p. 131); the first section whereof provides, among other things, that "it shall not be lawful for the directors of any mining corporation to sell, lease, mortgage, or otherwise dispose of the whole or any part of the mining ground owned or held by such corporation . . . . unless such act be ratified by the holders of at least two-thirds of the capital stock of such corporation." The court below found that defendant is a mining corporation, and that said mortgage has never been ratified by the holders of its stock in accordance with the provisions of said statute. But the court further found that the land covered by the mortgage

"was and is not mining ground as specified by said statute, but was and is agricultural land." There was judgment of foreclosure as prayed by plaintiff.

The question most in dispute at the trial was upon the character of the mortgaged premises—whether "mining ground" within the meaning of said statute, or not. There was evidence without conflict that defendant bought the land for mining purposes, and engaged in the business of taking from a portion thereof, through a tunnel and sundry other excavations, certain rock which defendant called "lustral" or "paint-stone," pulverizing the same by means of machinery on 'the ground, and selling and attempting to sell the product thus obtained, which was to some extent used in the manufacture of paint, and was of some utility for that purpose. Defendant had a mill building on the premises, sixty by one hundred and forty feet in size, which was "pretty well filled," such was the testimony, with machinery for drying and crushing the rock. Such business was carried on at and prior to the time of the execution of said notes and mortgage. Some time afterward defendant ceased operations, and failed in its said business, the total sales of the product having been less than one thousand dollars. A witness produced as an expert testified for plaintiff that he considered said rock to be a common country formation; that it was not mineral bearing, though it had a very small percentage of mineral in it; that it was not valuable for mining ground. It appeared from his evidence, however, that the rock lies in strata and is different from other formations on the land; also that he considered mining ground to be such as produces mineral in paying quantities. He was asked: "If you mine rock from the earth, and you draw from that rock such mineral as produces paint or polish, don't you mine for that?" and replied, "That would be mining if the mineral was there in paying quantities." There was other evidence tending to show 'that the land was chiefly valuable for agricultural purposes.

The defense relied on is hardly conscionable under the circumstances appearing, and it is with reluctance that we conclude that the decision of the court respecting the character of the land, within the contemplation of the act of 1880, is contrary to the evidence. But the statute declares unlawful a mort-

gage or other disposition by the directors of the whole or any part of the mining ground of a mining corporation, except upon the ratification of the holders of two-thirds of the stock, and it must be enforced according to its intent. Several instances of its application have occurred. (*McShane v. Carter*, 80 Cal. 310; *Pekin Min. Co. v. Kennedy*, 81 Cal. 356.) The question is upon 'the meaning of the terms "mining ground" employed in the statute. It has been suggested that these words should be understood as the equivalent of "lands valuable for minerals" and "valuable mineral deposits" in the statutes of the United States relating to the sale of those parts of the public domain so designated (U. S. Rev. Stats., secs. 2318, 2319); and hence that land cannot be considered mining ground under the aforesaid act of 1880 unless it is of such character that, had it been public land, it might have been located as a mining claim and purchased as such from the government. We think, however, that this understanding of the statute, if adopted, would lead us into bogs and fens of uncertainty respecting its interpretation. In the first place, the decisions of the officers of the federal land department show that some lands have been held subject to location as mineral under the federal laws which can scarcely be regarded as the subject of mining in the ordinary sense. Thus in *McGlenn v. Wienbroeer*, 15 Land Dec. 370, the department ruled that public land, chiefly valuable for a peculiar building stone thereon, was subject to entry under the mining laws and not as agricultural land, although it was worked as a quarry only. And so of lands valuable only for deposits of marble. (*Marble Co. v. Railroad Co.*, 25 Land Dec. 233.) Other rulings of similar import might be cited. Unless we are prepared to admit that an ordinary open stone quarry constitutes "mining ground" as meant in our statute, then we could not accept these rulings as a guide. On the other hand, it is said to have been held by the department in *Green v. Grumbley*, decided May 20, 1896, that the presence of a thick vein of coal in public land does not render its character mineral when shown to be not susceptible of mining at a profit. (Clark's Mineral Law Digest, 346.) Also that bog iron is not a mineral. (Clark's Mineral Law Digest, 28.) And in *Etling v. Potter*, 17 Land Dec. 424, it was held that the

presence of gold in land does not characterize it as mineral unless it is in paying quantities. It seems to us that if a California mining corporation should own and mine a thick vein of coal it would be impossible not to hold the ground so used to be its "mining ground" within the act of 1880, whether the operations should prove profitable or not; and so of land which it might own and mine for gold, although the mining might result in loss. In one instance the commissioner ruled that only land containing metalliferous ores should be regarded as mineral, but this decision was reversed by the secretary of the interior, and it seems to be now established as the rule of the department that "lands chiefly valuable for mineral deposits, of whatever kind or nature, may be properly disposed of under the mining laws." (*Aldritt v. Railroad Co.* (Nov. 6, 1897), 25 Land Dec. 349; *Marble Co. v. Railroad Co., supra.*)

Again, as we see the question whether "mining ground" means the same thing as land subject to mineral entry, it is set at rest by the decisions of this court. Thus, it is held that a lien given by statute upon "mining claims" cannot be extended to mines operated on land held under Mexican grant or agricultural patent. (*Morse v. De Ardo,* 107 Cal. 622; *Williams v. Miners' Assn.,* 66 Cal. 193.) Surely, however, lands of the latter class might constitute "mining ground." And in *Estate of Byrne,* 112 Cal. 176, 179, the foundation of the decision is that a mine or mining ground has no necessary identity whatever with mineral land patented as such by the United States. The case of *Ball v. Tolman,* 119 Cal. 358, arose under the statute imposing penalties on the directors of a mining corporation for omitting certain acts required of them in the course of the business (Stats. 1880, p. 134); one of the defenses set up was that the operations of the company—which ended in complete failure—were carried on in the bed of the Sacramento river and were not "mining"; the court said: "It is immaterial, if true, that the river bed where navigable was not subject to location as a mining claim; the company did mining there, or endeavored to do so, and expended money of the corporation in the effort, and the requirements of the law . . . . cannot be evaded by showing that the company was wrongfully searching for gold in a navigable stream."

We suppose there can be no doubt that an actual mine—land subjected to the processes of mining—is "mining ground" in the sense of the statute. What, then, is a mine, or what is mining? In *Rex v. Sedgley*, 2 Barn. & Adol. 65, the question was whether certain property from which limestone was obtained, by means of tunneling and other excavations, to be used in smelting iron and in the manufacture of lime, constituted a mine. The court (per Lord Tenterden, C. J.) having adverted to an attempt by counsel to restrict the term "mine" to works for the extraction of metals, proceeded: "If the existence of metal be necessary to constitute a mine, salt works, from which salt is obtained in the way this stone was obtained, will not be mines, nor, indeed, will coal works be mines. . . . . And to deny the character of a mine to the works in question would, as it appears to us, be to depart from the ordinary and proper meaning of that word in the English language." In *Rex v. Brettell*, 3 Barn. & Adol. 424, the court held that similar works for obtaining fire-brick clay were a mine, saying: "In order to determine whether an excavation in the earth constitutes a mine or not we are to look to the mode in which the article is obtained, and not to its chemical or geological character." In *Westmoreland Coal Co.'s Appeal*, 85 Pa. St. 344, it was held that as to coal a worked vein is a mine, and the court said: "By working the vein it becomes a mine." In *Hartwell v. Camman*, 10 N. J. Eq. 128, 64 Am. Dec. 448, it was held that paint-stone found in strata below the surface of the soil, distinct from the ordinary earth, and worked by ordinary means of mining, will pass by the designation of "mines and minerals" in a deed. In *Ball v. Tolman, supra,* dredging the bed of a navigable river for gold—which operations yielded no returns whatever—was yet held to be mining, and among the reasons assigned for the decision was that the 'method adopted was among the modes of placer mining. In *Hines v. Miller*, 122 Cal. 517, it was held that one engaged in the construction of shafts, tunnels, and the like, for prospecting and developing a mine, is engaged in mining as much as he 'who extracts gravel or ore from the mine. Suppose the shafts and tunnels should fail to strike profitable ore or gravel (which was probably the fact in *Hines v. Miller,* as the action was to enforce liens for unpaid labor done on the

ground), would the operations be any the less "mining"? Or suppose some expert should testify that the ground explored was worthless for any purpose of profit, we think his opinion would hardly justify the conclusion that the ground was not in fact mined—assuming, of course, that the operations were prosecuted in good faith.

We do not hold that the inferences to be deduced from the authorities cited would control the decision of all questions which may arise concerning the proper definition of a mine or mining ground; for the phases in which such questions may occur are, perhaps, very varied; but we think it clear that when a mining corporation, in good faith, works by ordinary mining processes deposits of stone or other mineral on land owned by it with a view to utilizing the product for commercial purposes, the land thus worked and exploited is "mining ground" within the meaning of the act of 1880, whether the undertaking results in loss or profit, and whether sound judgment and discretion would approve that use of the land or not.

The expert testimony that the land mined is of no value as mining ground is of no consequence, for the reason, if none other, that in a case such as this it sets up a false standard, viz., that mining ground must be land bearing mineral in quantities which make it profitable for working—a test which would make the question dependent upon market demand for the product and the thousand varying contingencies of the cost of production.

There is no doubt on the evidence that some portions of the mortgaged land were actually mined by defendant with a view to profit, and as to those parts, together with the mill and other appurtenances (*McShane v. Carter, supra*), the prohibition of the statute clearly applied. Whether the tract outside the six or eight acres upon which the mining operations seem to have been directly prosecuted ought to be considered as also within the statute, if proved to be worthless for mining purposes and not necessary to the working of the other, is a question not raised by the record and which we do not decide. The act does not relate to the real property of such a corporation generally, but only to its mining ground. (*Granite Gold Min. Co. v. Maginness*, 118 Cal. 139.)

The judgment and order denying a new trial should be reversed.

Chipman, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion 'the judgment and order denying a new trial are reversed.

<div align="right">

Temple, J.,     Henshaw, J.,

Harrison, J.,     McFarland, J.,

Beatty, C. J.