[Sac. Nos. 1744, 1750, 1764.  In Bank.—May 27, 1910.]

ROYAL CONSOLIDATED MINING COMPANY (a Cor-
poration), Appellant and Respondent, v. THE ROYAL
CONSOLIDATED MINES (CALIFORNIA) COM-
PANY LIMITED (a Corporation), J. C. KEMP VAN
EE, ALBERT RAYMOND, LEON EPHRIAM MOR-
RIS, WILLIAM BRYSON BUTLER, and JOHN
THOMAS HODSON, Respondents.

LEON EPHRAIM MORRIS, WILLIAM BRYSON BUT-
LER, and JOHN THOMAS HODSON, Cross-Complain-
ants, Appellants and Respondents, v. ROYAL CONSOLI-
DATED MINING COMPANY (a Corporation), THE
ROYAL CONSOLIDATED MINES (CALIFORNIA)
COMPANY, LIMITED (a Corporation), Cross-Defend-
ants, Respondents and Appellants.

VENDOR'S LIEN—CONTRACT TO CONVEY MINE—BENEFIT OF CORPORATION
—SECURITY TO VENDOR—LIEN NEGATIVED.—Where the existence of
a vendor's lien depends upon the construction of a contract to con-
vey a mine for the benefit of a British corporation to be organized,
upon a basis of security to the vendor, and a fair construction of
the contract manifests an intent plainly inconsistent with the reser-
vation of a vendor's lien, no such lien can be enforced.

ID.—NATURE OF VENDOR'S LIEN—CODE PROVISION—EQUITABLE ORIGIN—
RESULT.—Although section 3046 of the Civil Code provides that
"one who sells real property has a vendor's lien thereon, independent
of possession,' for so much of the price as remains unpaid and
unsecured otherwise than by the personal obligation of the buyer,"
yet the lien does not find its origin in this enactment, but has been
generally recognized by courts of chancery. It is not the result of
any agreement or any intention of the vendor and vendee, but is a
simple equity raised by courts for the benefit of vendors of real
estate.

ID.—PRESUMPTION IN FAVOR OF LIEN.—Where there is nothing to indi-
cate an intention one way or the other, the lien is presumed to
exist, and is an incident of the transaction of sale.

ID.—PERSONAL RIGHT—LOSS BY WAIVER—CONSIDERATION OR WRITING
NOT REQUIRED.—The right of lien afforded to the vendor of enforc-
ing payment of the consideration against the property conveyed is
a personal one, and it may be waived and relinquished without
consideration and without a writing. When the lien is once waived
it is gone forever.

CLVII Cal.—47

ID.—MANIFESTING INTENT NOT TO RELY ON LIEN—SECURITY WITHOUT RESERVATION.—If the vendor does any act manifesting an intention on his part not to rely on the lien given by law for the purchase money, such as taking security therefor without an express agreement that he may still have his vendor's lien, the lien will not exist.

ID.—SCHEME OF CONTRACT AGAINST LIEN—CONVEYANCES CLEAR OF ENCUMBRANCE—SECURITY FOR PAYMENT.—The scheme of the contract, as a whole, by which the mines owned by the plaintiff were to be conveyed clear of all encumbrance to an agent for the benefit of a British incorporation to be organized, upon three times the capitalization of plaintiff, the title of which agent was to be conveyed thereto free of all encumbrance and the proceeds of shares of stock deposited in escrow were to be divided and applied on purchase money, and a percentage of the proceeds of mining were to be likewise applied, excludes the idea that a secret lien in favor of the vendor was to be retained, as being inconsistent with the execution of such scheme.

ID.—WAIVER OF LIEN—DEFAULT IN DIVIDING SHARES IMMATERIAL.—Where it sufficiently appears that plaintiff intended to and did waive any lien on the property sold, an alleged default of the purchaser in failing to divide the shares was immaterial, as such default could not create a lien when none had theretofore existed.

ID.—JUDGMENT NOT PERMISSIBLE AGAINST AGENT—SUPPORT OF FINDING AGAINST BREACH.—The plaintiff could not claim a personal judgment against the agent to whom the title was first conveyed for alleged breach of the contract, where the court found upon sufficient evidence that he did not commit such breach.

ID.—CORRECT JUDGMENT AGAINST PLAINTIFF—PLAINTIFF'S OBJECTIONS TO CLAIMS OF OTHER PARTIES NOT REVIEWABLE.—Where the court below rightly determined that plaintiff had no vendor's lien and was not entitled to any relief, any other objections made by plaintiff to claims of other parties, in which he has no concern will not be reviewed upon appeal.

ID.—DEED OF TRUST OF MINING PROPERTY — RATIFICATION BY STOCKHOLDERS—CONSTRUCTION OF ACT OF 1880—MODIFICATION OF STRICT RULE.—The strict construction and application of the act of 1880, requiring the formal ratification of two thirds of the capital stock of a mining corporation as essential to the validity of a sale or mortgage of its mining ground, as against its creditors, its stockholders, and the corporation itself, made by former decisions has been relaxed by more recent decisions; and the proper rule now is, that where the persons holding the required two thirds of the stock have in a formal and unequivocal way announced their assent to the proposed transaction, their rights are as fully safeguarded as if they had ratified the transfer, purchase, or mortgage by subsequent writing or at a meeting.

ID.—ACT TO BE CONSTRUED AS ILLUSTRATIVE.—The act of 1880 is to be construed as illustrative and not as exhaustive of the manner of ratification.

ID.—FORMAL CONSENT BY DIRECTORS HOLDING TWO THIRDS OF STOCK.— Where a director of the corporation was the holder of two thirds of the stock of the British corporation at the time of the authorization and execution of the mortgage, his act in authorizing, executing, and acknowledging the mortgage as a director of the corporation, answered every requirement of the act.

ID.—TEST OF RIGHT TO RATIFY—LEGAL RIGHT TO VOTE.—If given persons form two thirds of the stockholders authorized to vote at a stockholders' meeting, they may act as stockholders in signing and acknowledging a written ratification, and mere beneficial interests therein not appearing upon the face of the books of the corporation cannot be considered. The test of the right to vote as a stockholder at corporate meetings is the ownership of shares as disclosed by the record books of the corporation ten days before the vote.

ID.—RIGHTS OF BENEFICIAL OWNERS.—The fact that the court may look behind the legal ownership and sustain a ratification by two thirds of the beneficial owners does not prevent the legal owners from making a legal ratification as invested with the legal title to the stock.

ID.—FINDINGS AGAINST EVIDENCE—RIGHT TO FORECLOSE DEED OF TRUST TO SECURE CREDITORS—REVERSAL.—*Held,* that findings that a deed of trust of the mine to secure the creditors of the British corporation was invalid; that it could not be foreclosed, and that the trustees could only recover a legal judgment against such corporation, were against the evidence, and that the trustees had the right to foreclose the deed of trust; and the judgment in that respect must be reversed and a new trial ordered. In such case, this court cannot direct a different judgment on the findings upon any theory of estoppel of the corporation by its conduct, nor on the ground that the findings against evidence were not within the issues.

ID.—OBJECTION BY RESPONDENT — DEFENSE NOT PLEADED. — The respondent cannot resist reversal on the ground of any defense not pleaded.

APPEALS from judgments of the Superior Court of Calaveras County and from orders denying new trials. A. I. McSorley, Judge.

The facts are stated in the opinion of the court.

Bishop, Hoefler, Cook & Harwood, and A. J. Harwood, for Leon Ephriam Morris, William Bryson Butler, and John Thomas Hodson, Defendants and Cross-Complainants, Appellants and Respondents.

Solinsky & Wehe, for Royal Consolidated Mines (California) Limited, a Corporation, and J. C. Kemp Van Ee, Appellants and Respondents.

Nicol & Orr, Campbell, Metson & Campbell, and S. D. Woods, for Royal Consolidated Mining Company, Appellant and Respondent.

Jesse W. Lilienthal, for Albert Raymond, Respondent.

Vogelsang & Brown, for Alfred Jutton, Receiver, Respondent.

SLOSS, J.—On the ninth day of February, 1898, Royal Consolidated Mining Company, a corporation (designated in this opinion as the "vendor" or the "California corporation"), entered into a written contract with J. C. Kemp Van Ee for the sale by it to him of certain mining properties in Calaveras County. The terms of the contract, which will be set out at greater length hereafter, provided for the incorporation by the purchaser of a company under the Joint Stock Companies Acts of Great Britain, for the purpose of acquiring the properties. Such company, the Royal Consolidated Mines (California) Company Limited (which will be referred to by us as the "British corporation") was formed, and title to the properties in question became vested in it. In 1902 this corporation executed, or attempted to execute, to Frederick Rheinwald Bullock, William Bryson Butler, and John Thomas Hodson, as trustees, an instrument purporting to convey said properties to the trustees as security for the payment of seventy-five thousand pounds of debenture stock to be issued by the corporation (and in fact subsequently issued by it) to persons lending money on the faith of such debentures. Pending this action, Bullock, one of the trustees, died, and was succeeded by Leon Ephraim Morris.

This action was brought by the California corporation against the British corporation, J. C. Kemp Van Ee, the trustees above named, and other defendants designated by fictitious names, to foreclose a vendor's lien upon the property conveyed by said plaintiff, its claim being that some $312,000 with interest was due on the purchase price of the mines, and that it was entitled to a lien for such unpaid balance. Each of the named defendants appeared and resisted plaintiff's claim. Albert Raymond, appearing as a defendant sued by a fictitious name, also denied the existence of plaintiff's asserted lien.

Raymond himself claimed a lien on the property by virtue of an attachment for the sum of $64,421 and interest, levied in an action brought against the British corporation.

The trustees, Morris, Butler, and Hodson, filed in addition to their answer a cross-complaint, seeking foreclosure of the instrument executed to them to secure payment of the seventy-five thousand pounds of debentures.

The trial resulted in findings upon which the court entered its judgment: 1. That plaintiff recover nothing and that its action be dismissed against defendants and cross-complainants; 2. That cross-complainants take nothing as against plaintiffs and defendants, except that cross-complainants have and recover from the British corporation the sum of $242,500 with interest; 3. That defendants recover costs from plaintiff; 4. That Van Ee and Raymond recover costs from cross-complainants; 5. That cross-complainants recover costs from the British corporation. In other words, the court determined in the original action that the plaintiff had not established its right to a vendor's lien, and, in the cross-action, that the instrument under which the trustees claimed was not a valid mortgage and could not be foreclosed, but that such trustees were entitled to a money judgment against the British corporation for the sums actually advanced to it by the debenture holders.

From this judgment three appeals have been taken. No. 1744 is the appeal of the cross-complainants (trustees) from those parts of the judgment denying them the relief of foreclosure, giving them a money judgment, and awarding costs against them. They appeal also from an order denying their motion for a new trial.

No. 1750 is the appeal of plaintiff from the parts of the judgment decreeing that it recover nothing, that the action be dismissed, that cross-complainants have judgment for $242,500 and that defendants recover from plaintiff their costs.

No. 1764 is an appeal taken by the British corporation and J. C. Kemp Van Ee from the part of the judgment whereby cross-complainants (trustees) recover a money judgment and costs against said corporation.

The bills of exceptions presented by the respective parties are, except for the assignments of error, identical, and for this

reason, among others, the various appeals can most conveniently be considered in a single opinion.

It will be well to take up first the questions arising on plaintiff's appeal (No. 1750) from the judgment declaring that it is not entitled to a vendor's lien. Some of the facts to be stated in this connection will be important in considering the other appeals.

The complaint sets forth at length the terms of the agreement of February, 1898, between the plaintiff, the then owner of the properties in question, and Van Ee. This agreement, after reciting that the plaintiff is the owner of the mining properties in question, and that Van Ee is desirous of acquiring such property, provides that the vendor (plaintiff) agrees to sell, and Van Ee agrees to purchase, the aforesaid properties for the sum of four hundred thousand dollars, payable as provided in the agreement. The purchaser, it is agreed, shall on the signing of the agreement, pay the sum of sixty thousand dollars to the credit of the vendor with the Anglo-Californian Bank, Limited, at its San Francisco office, on account of the purchase consideration. The third paragraph reads as follows: "The purchaser shall proceed forthwith to incorporate a company in London under the Joint Stock Companies Acts of Great Britain, for the purpose of acquiring the aforesaid properties, and said company shall have a nominal capital of 250,000 shares of one pound each, of which 25,000 shares, at the par value, shall be reserved for the purpose of providing working capital for the said properties, and the balance of shares, namely, 225,000 shares, shall be issued fully paid up and be deposited in London with the Anglo-Californian Bank, Limited, as security for the payment of the balance of the purchase consideration of $400,000 for the said properties, and upon the allotment and deposit of said 225,000 shares, the property shall be duly and legally conveyed by the purchaser to the company to be formed as aforesaid to acquire the same, free from all encumbrances."

The agreement further provides that the balance of the purchase price, namely, three hundred and forty thousand dollars, "shall be paid in the manner following, that is to say, an amount equal to eighty per cent. of the net proceeds arising from the working of said mines shall be paid to the vendor monthly on or before thirty days after the time of each and

every clean-up, and shall be credited as aforesaid on account of the purchase consideration; provided, however, that as sales are made of said 225,000 shares, or any part thereof, as herein provided, the purchaser shall pay only such proportion of said amount equal to said eighty per cent. of said net proceeds as the number of shares remaining in said bank bears to the total of 225,000 shares." The following paragraph provides that "the purchaser, however, shall have the right from time to time to otherwise discharge so much of the purchase consideration as he may think fit by the sale of as many of the said 225,000 shares as he may think necessary or advisable, always provided that none of the said shares shall be sold for less than their par value, and that in any event, as the same may be sold, they may be withdrawn by the purchaser or released, as he shall direct, against a payment to said bank for account of said vendors of ninety per cent of the par value of said shares, to apply upon said purchase consideration."

After the payment, however made, of the balance of the purchase price, all the shares remaining in the hands of the bank are to be delivered to the purchaser. The vendors agree in paragraph 8 that upon the payment of the sixty thousand dollars they will deposit with the Anglo-Californian Bank, Limited, in San Francisco, a good and sufficient deed conveying to the purchaser, his nominee or nominees, satisfactory title to all of said properties free and clear of all encumbrances whatsoever, together with a letter of instructions authorizing and directing said bank to deliver such deed upon receiving from the Anglo-Californian Bank, Limited, in London, a cablegram to the effect that the said 225,000 shares have been deposited with the said bank in London to be dealt with in accordance with the terms of the contract. It is provided that until the payment of the balance of $340,000 the vendors may have a representative upon the properties, but that upon the payment of the $60,000, possession of the properties is to be turned over to the purchaser. By the terms of paragraph 11 it is agreed that if the whole purchase consideration shall not have been paid at the expiration of four years "then the balance of shares remaining in said bank shall, at such time thereafter as may be determined by said vendors, be divided between vendors and purchaser so that the purchaser receive such proportion of said shares as the whole amount of money

paid by him hereunder bears to the entire amount of said purchase consideration; and the vendors shall receive the balance of shares in satisfaction of the purchaser's covenant to purchase." The agreement further provides that it is to be binding upon and inure in favor of the heirs, representatives, successors, and assigns of the respective parties.

Upon the execution of said agreement of February 9, 1898, Van Ee paid to the plaintiff the sum of sixty thousand dollars, and plaintiff delivered up the possession of the said properties in accordance with the terms of the contract, which possession was held by Van Ee until the organization of the British corporation. At the same time plaintiff executed its deed of the properties to Van Ee, and deposited such deed in escrow with the Anglo-Californian Bank, Limited. In May, 1898, Van Ee and John Thomas Hodson, who was interested with him in the transaction, caused to be incorporated a company in London under the Joint Stock Companies Acts of Great Britain for the purpose of acquiring the property described in the contract. (The contract of February, 1898, had theretofore been assigned by Van Ee to Hodson.) This corporation, known as the Royal Consolidated Mines (California) Company Limited, is the one herein referred to as the British corporation. It was organized with a nominal capital of 250,000 shares of one pound each. Upon its organization it entered into a contract with Hodson, whereby Hodson agreed to sell and the British corporation to purchase, free from encumbrances, the properties here in controversy, for the sum of 225,000 pounds, to be paid and satisfied by the allotment to the vendor, or his nominee, of 225,000 fully paid shares in the company of one pound each. It was provided that the sale should be completed on the twentieth day of July, 1898, and that the company should before that time issue certificates for the said 225,000 shares as required by Hodson, and lodge the same with the Anglo-Californian Bank, Limited, at its London office. The 225,000 shares of capital stock of said British corporation were issued fully paid to Hodson, and were by him deposited with the Anglo-Californian Bank in London pursuant to the terms of the contract between plaintiff and Van Ee. Thereupon the deed from plaintiff to Van Ee, which had been deposited in escrow with the Anglo-Californian Bank, Limited, in San Francisco,

was, in accordance with the provisions of the contract of February 9, 1898, delivered to Van Ee. Van Ee executed his deed conveying the properties to the British corporation, and the latter took possession of the properties. It immediately commenced to work and improve the said property and expended large sums in the operation of the mines and the placing of improvements thereon. Out of the proceeds there was paid to plaintiff, pursuant to the terms of its contract, the sum of $29,-479.96. With the exception of this sum, no part of the balance of $340,000 of the purchase price has been paid. The four years allowed for payment of the consideration of Van Ee's purchase expired on the ninth day of February, 1902. At that time and thereafter the plaintiff entered into several agreements with Van Ee, modifying the terms of the original agreement and extending the purchaser's time for performance. It is alleged in the complaint that all of these extensions were made without any consideration moving to the plaintiff, and that all the agreements made by it were executed and received on the part of Van Ee and of the British corporation without any intention upon the part of either of them of performing or fulfilling them. The court finds these allegations to be untrue, and, without prolonging the discussion by an examination of the evidence, we shall simply state that we think these findings, so far as they are material on this appeal, are fully sustained. The issue of the seventy-five thousand pounds of debenture stock and other transactions connected therewith are set out in the complaint and charged to have been part of a fraudulent scheme concocted by Van Ee and the British corporation for the purpose of complicating and clouding the title to said property, and to prevent said plaintiff from being able to collect the balance of its purchase price. The findings are contrary to these averments, too, and there is, in fact, no substantial evidence tending to show any such fraudulent intent. It is found that the plaintiff has never at any time determined the time as provided in the contract of February 9, 1898, when the balance of shares remaining in said bank should be divided between it (said plaintiff) and Van Ee, nor made demand therefor, but at all times since the expiration of the time provided for in the contract and the extensions thereof (except when the shares were, with the consent of the plaintiff, in the hands of third parties) the British corporation has.

been ready to make such division and deliver to plaintiff the shares belonging to it under the contract.

With reference to plaintiff's claim of a vendor's lien the court finds that it was plaintiff's intention at the time of the execution of the contract of February 9, 1898, to sell and convey to Van Ee the properties in question absolutely for the purpose of conveying the same absolutely to the corporation to be organized, and plaintiff did not intend to nor did it have or retain in said property a vendor's lien or any lien for the unpaid balance of the said purchase price, and it was the intention of the said plaintiff to waive any lien as vendor or otherwise that it might have or claim on said property for said balance and it did waive said lien.

On the question whether or not there was a lien the parties on both sides base their respective claims mainly on the terms of the contract of February 9, 1898.     We think that contract, fairly construed, manifests, on the part of the vendor, an intent plainly inconsistent with the reservation of a lien on the properties to be conveyed.

Section 3046 of the Civil Code provides that "one who sells real property has a vendor's lien thereon, independent of possession, for so much of the price as remains unpaid and unsecured otherwise than by the personal obligation of the buyer." But the lien does not find its origin in this statutory enactment.     It has been generally recognized by courts of chancery. It is "not the result of any agreement or any intention of the vendor or vendee, but is a simple equity raised by courts for the benefit of vendors of real estate." (*Avery* v. *Clark*, 87 Cal. 623, [22 Am. St. Rep. 272, 25 Pac. 919].) Accordingly, where there is nothing to indicate an intention one way or the other, "the lien is presumed to exist, and is an incident of the transaction of sale." (*Finnell* v. *Finnell*, 156 Cal. 589, [134 Am. St. Rep. 143, 105 Pac. 740].) In the case last cited, the lien was upheld, although the vendor was unaware, at the time of the sale, of the fact that he was, under the law, entitled to a vendor's lien.     On the other hand, the "right thus afforded of enforcing payment of the consideration against the property conveyed is a personal one, and it may be waived and relinquished without consideration and without a writing (see *Claiborne* v. *Castle*, 98 Cal. 30, 33, [32 Pac. 807]), and, when once waived, is gone forever.     It is thoroughly settled that, if the vendor

do any act manifesting an intention on his part not to rely on the lien thus given by law for the payment of the purchase money, such as taking security therefor, without an express agreement that he may still have his vendor's lien, the lien will not exist." (*Finnell* v. *Finnell*, 156 Cal. 589, [134 Am. St. Rep. 143, 105 Pac. 740], citing cases.)

The respondents point to various elements of the transaction to support the contention that the plaintiff waived any lien. Without considering separately such arguments as that the plaintiff took security or that the contract did not make the vendee liable for any liquidated purchase price measurable in terms of money, we have no hesitation in declaring our conviction that the contract, viewed as a whole, evidences a scheme or plan of dealing which is inconsistent with the retention by the vendor of any lien on the properties. That scheme, briefly stated, was this: The mines, owned by plaintiff, were to be conveyed, free and clear of encumbrance, to Van Ee. Van Ee was to form a corporation, and to transfer the properties, likewise unencumbered, to it. Ninety per cent of the shares of stock of such corporation were to be deposited in a bank, to be dealt with in a given manner. These shares were to be subject to sale by the vendee or his associates, but a stated proportion of the sum realized on any sales was to go to the plaintiff in satisfaction of the consideration stated in the agreement. Similar provision was made with reference to a percentage of the proceeds arising from the operation of the mines by the vendee or his assigns. The number of shares to be deposited was 225,000, of the par value of one pound each. Sales of these shares were to be made at not less than their par value. In other words, the agreement contemplated that a title apparently free and unencumbered should be conveyed to a corporation which should, upon the basis of such title, issue and sell its shares to an amount exceeding a million dollars. The plan called for a nominal capitalization of about three times the price which plaintiff was willing to take for its properties, and provided that the shares should be sold to the public at a rate which would bring in an amount equal to or exceeding their face value. What may fairly be supposed to have been in the contemplation of the parties to this agreement? Did the plaintiff and Van Ee intend to sell to prospective shareholders, at this price, an interest in

a property which was subject to a paramount, but unrecorded, lien for $340,000, or did they propose to offer at par, shares in a corporation owning a clear title to the property? A reading of the agreement leaves no doubt that this question must be answered by saying that no secret lien in favor of the original vendor was intended to be retained. *In re Brentwood Brick & Coal Co.*, L. R. 4 Ch. Div. 562, was a case in which property was conveyed to a corporation for a consideration of six thousand pounds, to be paid by the payment to the vendor of fifty per cent of all money received by the company on the sale of shares, and a like fifty per cent of all money by way of capital to be at any time borrowed by the company, until the six thousand pounds should be paid. The transaction was held to be such as to exclude the idea of the retention of a vendor's lien. Referring to the provision for payment out of proceeds of shares sold or money borrowed, James, L. J., said: "To my mind it is clear that he intended to rely on that fund for payment, and intended that the company should have the means of borrowing. This is quite inconsistent with a lien which would probably make the company unable to pledge their property." The reasoning applies with equal force to the provision here for the sale of 225,000 shares at not less than their par value. Neither the plaintiff nor Van Ee could have considered it feasible to market at par any part of an issue of 225,000 one-pound shares of a corporation owning no assets beyond an equity of redemption (worth, perhaps, $60,000) in a property subject to a lien of $340,000. Again, the covenant that the plaintiff's conveyance to Van Ee, and his subsequent transfer to the British corporation should be free and clear of encumbrances excludes the idea that a title subject to a lien in favor of the plaintiff was to be retained. It is true that in *Slide & Spur Gold Mines* v. *Seymour*, 153 U. S. 509, [14 Sup. Ct. 842], it was held that a somewhat similar covenant was to be construed as referring "to prior charges and encumbrances" and not to "any which arise out of the conveyance itself." But in that case there was but a single transfer directly from the vendor to a corporation organized by the vendee to take title. Here the property was to be conveyed to Van Ee, and by him to a corporation. Even if we give to the covenant for a transfer free of encumbrances the restricted meaning applied in the

*Slide & Spur* case, the vendor's lien claimed must have attached at the moment of the transfer to Van Ee. It would, therefore, have been prior to the conveyance by Van Ee to the British corporation, and was excluded by the provision that that transfer should be free of encumbrance.

But apart from this somewhat technical consideration, we prefer to rest our conclusion on the broader ground that the whole scope of this agreement, differing materially from that in the *Slide & Spur* case, is such as to make the existence of a vendor's lien inconsistent with the proper execution of the plan agreed upon.

We have not, in the foregoing discussion, given any attention to the attack made by appellant upon the finding to the effect that the purchaser had not defaulted in the matter of dividing the shares of stock of the British corporation with the plaintiff. If the court below was right, as we are satisfied it was, in holding that the plaintiff, at the time of executing the contract of February 9, 1898, intended to and did waive any lien on the properties, the alleged default had no bearing on its right to such lien. Failure to pay the purchase price cannot, of itself, create a lien, where none had theretofore existed. (*Fisk* v. *Potter*, 2 Keyes, (N. Y.) 76.) But if it be claimed that the breach by Van Ee gave plaintiff the right to some kind of a personal judgment against him, we think the point is sufficiently answered by saying that the finding that he had not committed the breach alleged has adequate support in the evidence.

In accordance with these views, it must be held that the court below rightly determined that the plaintiff did not hold a vendor's lien and was not entitled to any relief. If this be so, the plaintiff is not concerned with the correctness of the findings with respect to the claims or liens of other parties, and it will not, on this appeal, be necessary or proper to consider any points made by plaintiff with regard to such matters.

The appeal of the cross-complainants Morris, Butler, and Hodson, trustees, No. 1744, is, as we have said, from the portions of the judgment which deny foreclosure of the deed of trust and give a money judgment for the sums advanced.

The refusal of the relief sought was based upon the proposition that the indenture of trust or mortgage was void for want of compliance with the terms of the act of 1880, as

amended in 1897, for "the further protection of stockholders in mining companies." (Stats. 1880, p. 131; Stats. 1897, p. 96.) This act (now repealed) was the one which required ratification by the holders of two thirds of the stock in mining corporations of a sale or mortgage of any part of the mining ground owned or held by the corporation.

The findings are to the effect that on the second day of October, 1902, the board of directors of the British corporation determined to raise and borrow a sum of fifty thousand pounds and for that purpose to issue the debenture stock of the corporation to the amount of seventy-five thousand pounds. In order to secure the redemption and payment of this stock, a certain indenture by way of mortgage of all the property described in the complaint was, on the second day of October, 1902, at London, and as authorized by the directors of said corporation, made, executed, and delivered by and between said directors and the original cross-complainants Morris, Butler, and Hodson as trustees for the creditors of the corporation and the holders of said debenture stock. The instrument was acknowledged, and, on February 5, 1903, recorded in the office of the county recorder of Calaveras County. Thereafter the British corporation issued debenture stock to the amount of seventy-five thousand pounds and in consideration of a loan of fifty thousand pounds made to it by the British Transvaal & General Financial Company, Ld., delivered said stock to said British Transvaal & General Financial Company, Ld. The sum of fifty thousand pounds was actually received by the British corporation from said lender, and was the full and agreed consideration for said debenture stock. The same has always been, and now is, retained by the British corporation and no part of it has ever been repaid. That out of said sum of fifty thousand pounds the British corporation expended in permanent improvements on the mining property the sum of $206,791.50; that all of said improvements are now on and form a part of the property and are of the reasonable value of said last-named sum.

It is further found, and these are the findings which are attacked by the appellant trustees, that at the time of the borrowing of said money and the making, delivery, certification, and recording of said trust-deed all of the capital stock of said British corporation was owned in equal shares by the defend-

ants Van Ee and Hodson subject to the conditional ownership therein of the said plaintiff under and by virtue of the contract of February 9, 1898, and at no time during said period was said Hodson or any other person than Van Ee, the plaintiff, the owner or holder of more than one half of the capital stock of said corporation; that the indenture of October 2, 1902, was never ratified or authorized by the holders of two thirds of the capital stock of the defendant corporation as required by the act of 1880.

The act in question provided that: "It shall not be lawful for the directors of any mining corporation to sell, lease, mortgage or otherwise dispose of the whole or any part of the mining ground owned or held by such corporation, nor to purchase or obtain in any way (except by location) any additional mining ground, unless such act be ratified by the holders of at least two thirds of the stock of such corporation then outstanding. Such ratification may be made either in writing, signed and acknowledged by such stockholders or by resolution duly passed at any regularly called stockholders' meeting."

That there was no ratification, either by a writing signed and acknowledged by the stockholders *as such* or by resolution passed at a stockholders' meeting, is conceded. The position of appellants is, however, that Hodson was in fact the holder of more than two thirds of the stock of the corporation, that he authorized, executed, and acknowledged the instrument on behalf of the corporation as one of its directors and that such authorization, execution, and acknowledgment was a sufficient ratification to comply with the requirements of the act. It appears that the 225,000 shares, which were the consideration for the conveyance to the British corporation, were by it issued fully paid to Hodson and were by him deposited with the Anglo-Californian Bank in London as required by the terms of the agreement of February 9th. Thereafter Van Ee executed to the corporation a deed of said properties. The 225,000 shares so issued in the name of Hodson remained in the Anglo-Californian Bank until after the signing of the deed of trust in question, with the exception of a period during which they were, with plaintiff's consent, made subject to an option which was never exercised. So far as appeared from the books and records of the corporation Hodson was, at the date of the execution of the mortgage, the sole owner of this stock. The

record does not disclose that he had ever transferred any part of it to any other person. The interest which the court found to be held by Van Ee was such interest as may have been vested in him by reason of the fact that he and Hodson were to share equally in the profits of the transaction. The interest of the plaintiff was the right which it had to receive a certain proportion of the shares remaining unsold at the expiration of the four-year period designated in its agreement of February 9, 1898, with Van Ee.

The stock being in this condition, the deed of trust was signed under the seal of the British corporation by John T. Hodson and H. Percy Hood, directors, and J. K. Gray, secretary of the corporation, and by the trustees named in the deed. Attached to the instrument is the certificate of acknowledgment of the consul-general of the United States at London certifying that the instrument was acknowledged by John Thomas Hodson and Henry Percy Hood, directors, and J. K. Gray, secretary of the corporation, "who acknowledged to him that they were the officers of the said company who for and in the name of the said company have executed the foregoing instrument, they then and there severally acknowledged the same to be their respective free act and deed and as and for the act and deed of the said company for the uses and purposes therein set forth."

The act of 1880 has been under consideration by this court several times. The earlier cases showed a disposition to give a very rigid and strict interpretation to the provisions of the law, but this strictness has been somewhat relaxed in the more recent decisions. The first case involving the act was *McShane v. Carter*, 80 Cal. 310, [22 Pac. 178]. That was a suit to enjoin an execution sale of mining property. The plaintiff claimed title through a conveyance from a mining corporation which had owned the property. The deed had not been ratified by the stockholders. The execution was issued on a judgment obtained against the corporation after the date of the deed. It was held that in the absence of ratification by the stockholders no title passed from the corporation. The court's view of the effect of the statute was stated in these words: "We think that the provision of said act goes to the power or authority of the directors. It cannot be construed to relate merely to their personal liability, for no penalty is imposed upon them; and to so construe would be to practically nullify

the act. In our opinion the directors of mining corporations have no power or authority to convey the mining ground without the consent of holders of two thirds of the stock, given as prescribed by the act. And it follows without such consent that title does not pass. And if this be so, the question can be raised by any one who connects himself with the title of the corporation which owned the property, as well as by the stockholders thereof." *Pekin etc. Mining Co.* v. *Kennedy,* 81 Cal. 356, [22 Pac. 679], followed soon after *McShane* v. *Carter* and approved the holding of that case to the effect that a deed by a mining corporation of any part of its mining ground not shown to have been ratified by two thirds of the stockholders did not pass the title. These cases declared the rule—and the declaration was necessary to the decision in each instance— that the assent of two thirds of the stockholders was essential to the validity of the acts described in the statute. *McShane* v. *Carter* and *Pekin etc. Mining Co.* v. *Kennedy* were cited with approval in *Granite Gold Mining Co.* v. *Maginness,* 118 Cal. 137, [50 Pac. 269], although the particular transaction there involved was not shown to be within the purview of the statute. Again, in *Johnson* v. *California Lustral Co.,* 127 Cal. 283, [59 Pac. 595], the decision was that a mortgage of mining ground of a mining corporation not ratified by the stockholders could not be foreclosed, the court saying: "The statute declares unlawful a mortgage or other disposition by the directors of the whole or any part of the mining ground of a mining corporation, except upon the ratification of the holders of two thirds of the stock, and it must be enforced according to its intent. Several instances of its application have occurred," citing *McShane* v. *Carter* and *Pekin etc. Mining Co.* v. *Kennedy.* With these decisions before it, the supreme court of the United States, in *Williams* v. *Gaylord,* 186 U. S. 157, [22 Sup. Ct. 798], was called upon to consider the effect of the statute. The suit was brought in the United States circuit court by Williams to foreclose a mortgage made to him as the trustee of bondholders by the Gold Hill Mining Company, a West Virginia corporation, upon mining ground in California. The corporation defaulted, but foreclosure was resisted by purchasers at execution sales, under judgments rendered against the corporation. The defense set up was the want of ratification of the mortgage by the stockholders. The defendants pre-

vailed in the circuit court (96 Fed. 454) and in the circuit
court of appeals (102 Fed. 372.) The case came to the supreme
court on *certiorari.* That court, after deciding that the con-
struction and effect of the statute were matters in which the
federal courts would follow the decision of the state courts,
proceeded to examine the cases above cited and from them de-
duced the conclusion that this court had held (a) that without,
the consent of holders of two thirds of the stock, title to prop-
erty attempted to be conveyed does not pass; and, (b) that
that consent must be evidenced in the manner prescribed by
the act, i. e. "either in writing signed and acknowledged by
such stockholders or by resolution duly passed at a stockholders'
meeting called for that purpose." With respect to the sec-
ond proposition the court said: "This manner of ratification
was held to be necessary as we have seen, in *McShane* v. *Carter,*
80 Cal. 310, [22 Pac. 178], and that case has not been limited
or varied by any subsequent case, and we have no doubt of the
power of the state to so prescribe. . . . Nor can we contest
that power though we might, if we were permitted to exercise
an independent judgment, construe the statute as only illus-
trative and not as exhaustive of the manner of ratification."

In *Williams* v. *Gaylord,* 186 U. S. 157, [22 Sup. Ct. 798],
the supreme court of the United States was not declaring its
own view of the statute. It was merely ascertaining and ap-
plying the construction given to a state statute by the highest
court of the state. There is, therefore, nothing in the decision
to prevent us from inquiring whether this court has not, by its
decisions ·subsequent to *Williams* v. *Gaylord,* modified the
strict interpretation given to the act by our earlier cases.

On the first point, i. e. that title does not pass in the absence
of ratification by the stockholders, we think there is nothing in
any later case which modifies the rule as declared in *McShane*
v. *Carter.* The appellants place great reliance upon *Galbraith*
v. *Shasta Iron Company,* 143 Cal. 94, [76 Pac. 901], in which
it was held that one asserting a title in hostility to the cor-
poration and to those claiming under it, was not in a position
to object that the corporation's deed had not been ratified as
required. But this goes no further than the declaration of the
court in *McShane* v. *Carter.* In the opinion in that case, after
stating that title does not pass, the court goes on to say that
"the question can be raised by any one *who .connects himself*

*with the title of the corporation which owned the property,* as well as by the stockholders thereof." It was not there suggested that strangers to the title might raise the question, and we do not think the statement that the title did not pass was intended to convey the idea that the transaction could be treated as void by persons having no relation to the title of the corporation. Here, however, the objection is made by the corporation itself and by stockholders, and the question whether .the mortgage was, in the absence of ratification, absolutely void as to all parties, has no significance in connection with the point now under discussion. The parties here objecting are certainly in a position to insist that the instrument, if unratified, passed no title and created no lien.

On the proposition that the ratification of the stockholders must be in the manner and form prescribed by the statute, the statement in the McShane case that the directors had no power or authority to convey without the consent of holders of two thirds of the stock *"given as prescribed by the act"* has been materially modified by this court. In the first place, it should be noted that this declaration was not in strictness necessary to the decision in *McShane* v. *Carter,* since in that case, as in the other decisions of this court above cited, there was no contention that there had been a ratification by stockholders in *any* manner. But whether or not the statement be viewed as *dictum,* it can no longer, in view of the decision in *Lacy* v. *Gunn,* 144 Cal. 511, [78 Pac. 30], be regarded as a correct statement of the law. This was an action to quiet title. Both parties claimed through the Amalie Mining Company, the plaintiff under an execution sale and deed of the corporate property, and the defendant under a deed from one Ferris, to whom the company had made an assignment for the benefit of its creditors. The assignment antedated the judgment under which plaintiff was claiming. The property in question was mining property and the deed from the corporation had not been ratified by the stockholders in the manner prescribed in the act. There was, however, evidence tending to show that the directors who authorized the making of the assignment were the actual owners of more than two thirds of the stock. The court held that: "A previous consent or direction by two thirds of the stockholders, although purported to have been made in the capacity of directors, is, as against creditors

equivalent to a subsequent ratification." It is true that this rule was, in its application to the particular case, limited to the effect of a conveyance as against creditors, and that it was not in terms extended so as to affect stockholders. But we see no reason for any distinction in this regard. Under the rule of *McShane* v. *Carter,* and the cases following it, any person connecting himself with the title of the corporation, as for example, an execution creditor, was entitled to rely upon the provisions of the act, and no good ground suggests itself for· saying that a conveyance, good as against a judgment creditor. would not be equally good as against a stockholder. Applying the doctrine, then, to stockholders, as well as to creditors, we think the rule declared in *Lacy* v. *Gunn* to be sound and reasonable. The act was designed for the protection of stockholders and to guard them against the improvident action of directors. Where the persons holding the required two thirds of the stock have in a formal and unequivocal way announced their assent to the proposed transaction, their rights are as fully safeguarded as if they had ratified the transfer, purchase, or mortgage by subsequent writing or at a meeting. In other words, we think the proper rule is that suggested by the supreme court of the United States in *Williams* v. *Gaylord,*— namely, that the statute should be construed "as only illustrative and not as exhaustive of the manner of ratification." If, then, Hodson was the holder of two thirds of the stock of the British corporation at the time of the authorization and execution of the mortgage, his act in authorizing, executing and acknowledging the mortgage as a director of the corporation answered every requirement of the act.

There remains the question whether Hodson was the holder of two thirds of the stock, and, as such, empowered to ratify the mortgage. The court below seems to have proceeded on the theory that it must go behind the legal title, as disclosed by the corporate books, and find the holders of stock to be the persons who had the ultimate beneficial interest in the shares, and this, notwithstanding the fact that the record holder was himself beneficially interested, and that the shares had been put in his name, for proper and legitimate purposes, with the approval of the other parties in interest. We cannot give our assent to this view. The statute of 1880 provides that the ratification may be made either in writing, "signed and acknowledged by

such stockholders or by resolution duly passed at any regularly called stockholders' meeting." It will, of course, not be questioned that, whichever of these methods be followed, the individuals authorized to ratify will be the same. If given persons form two thirds of the stockholders authorized to vote at a stockholders' meeting, they may act as stockholders in signing and acknowledging a written ratification. The general rule is that the test of the right to vote as a stockholder at corporate meetings is the ownership of shares, as disclosed by the proper record books of the corporation. (3 Clark & Marshall on Private Corporations, sec. 653; *Hoppin* v. *Buffun,* 9 R. I. 513, [11 Am. Rep. 291]; *State* v. *Ferris,* 42 Conn. 560; *In re Argus Printing Co.,* 1 N. Dak. 435, [26 Am. St. Rep. 639, 48 N. W. 347].) In some jurisdictions the books furnish *prima facie* evidence of such right; in others, the showing of the corporate records is conclusive. In this state, so far, at least, as domestic corporations are concerned, the question seems to be definitely settled by statute. At the time of the enactment of the statute of 1880, and of the execution of the mortgage under consideration, section 312 of the Civil Code provided that "at all elections or votes had for any purpose . . . there must be a majority of the subscribed capital stock, or of the members, represented either in person or by proxy in writing. . . . Every person acting therein, in person or by proxy or representative, must be a member thereof or a *bona fide* stockholder, having stock in his own name on the stockbooks of the corporation at least ten days prior to the election. . . ." Since the section covers not only elections, but all votes, we take it (although this precise point is not here involved, and is consequently not decided), that the words "ten days prior to the election" are to be read, in the case of a vote for a purpose other than an election, as referring to a period prior to the meeting at which the vote is had. The section is sufficiently broad to cover a vote taken at a meeting of stockholders called under the act of 1880. At such meeting, the right to vote would reside in every *"bona fide* stockholder, having stock in his own name on the stockbooks of the corporation ten days prior to the" meeting, or, at least, at the time of the meeting. That Hodson was such stockholder is not to be doubted. In *Smith* v. *San Francisco & N. P. Ry. Co.,* 115 Cal. 584, [56 Am. St. Rep. 119, 47 Pac. 582], this court held that the requirement of section 312 that

the person voting be a *"bona fide"* stockholder authorized an inquiry into the character of the holding. In that case the ruling was that where the real owners of stock had, for the sole purpose of avoiding statutory liabilities, caused the stock to be registered in the names of persons having no interest in it, the nominal holders were not entitled to vote at an election for directors. But the court observed that the right to vote is, by the code section, conferred upon "stockholders," not upon "owners" of stock, and recognizes that one may be a *"bona fide"* stockholder without having the sole, or, indeed, any beneficial interest in the shares. "One may," says the court, "be a *bona fide* stockholder without being the owner of the stock. He may have caused himself to be registered as a stockholder in the utmost good faith, both toward the corporation and also toward his fellow stockholders, and yet he may not be the owner of the stock. . . . It may be placed in the name of one as trustee to hold under an express trust, without any interest in the stock, but for the sole purpose of applying the income or disposing of the proceeds of its sale according to the terms of the trust. It may be the property of an estate, and transferred into the name of the executor. In all such cases the transfer would be in good faith, and the person in whose name it was registered would be a *'bona fide'* stockholder." The relations between the plaintiff, Van Ee, and Hodson were such as to make it entirely natural and proper that the stock should stand in Hodson's name. The plaintiff's interest in the shares was contingent and indefinite. Under the terms of the contract of February, 1898, the plaintiff might receive full payment in money, and, in that event, would not be entitled to any stock. Van Ee's agreement with Hodson was, that the two should be equally interested in any shares remaining after the payment of four hundred thousand dollars to plaintiff. At the time of the execution of the mortgage, neither Van Ee nor the plaintiff corporation had anything more than an uncertain, future, and contingent interest in an unascertainable number of shares of the stock. The existence of these equities, indefinite in extent, did not so affect the *bona fides* of Hodson's holding of the stock, as to deprive him of the rights vested by law in a stockholder. (See *Market St. Ry. Co.* v. *Hellman,* 109 Cal. 571, 589, [42 Pac. 225].) The case is in no way analogous to that of a mere nominal holder, or "dummy." At the

date of the mortgage it would not have been possible for the plaintiff or Van Ee to show, as against Hodson, the right to a transfer of a single share.

We need not here consider whether section 312 of the Civil Code is applicable to the proceedings of foreign corporations. Even if the section be intended to prescribe a rule for the management of California corporations merely, it may well be looked to for aid in ascertaining the legislative intent in the enactment of the statute of 1880, which, as has been held, governed foreign as well as domestic mining corporations in their dealings with mining property situate in California. (*Pekin M. etc. Co.* v. *Kennedy,* 81 Cal. 356, [22 Pac. 679] ; *Williams* v. *Gaylord,* 186 U. S. 157, [22 Sup. Ct. 798].)   The word "stockholder" is used in both the code section and the act of 1880, and the interpretation given to the word in the one enactment is presumably applicable to the other.   If we were to hold that section 312 has no application here, the question would be, simply, whether Hodson was a stockholder.   We have already stated our reasons for concluding that he was a *"bona fide* stockholder."   *A fortiori,* he was, if the requirement of *bona fides* be omitted, a "holder" of two thirds of the stock.

The contention that, under the act of 1880, a ratification must be made by the persons owning the ultimate beneficial ownership in two thirds of the stock seems to be founded on a statement in *Lacy* v. *Gunn,* 144 Cal. 511, [78 Pac. 30].   The opinion in that case contains this declaration :   "It is the actual owners of the stock, and not those who appear to be so, who are under the protection of the statute, and whose ratification or consent is required."   This expression, like all declarations made by a court in disposing of a controversy, is to be read in the light of the facts considered.   The court was examining the validity of a transfer by a mining corporation of mining property, assented to by the actual owners of two thirds of the stock.   The transfer was upheld on the theory that, as the act was for the benefit of stockholders, the purpose of the law was satisfied if the transfer had the approval of the requisite proportion of those really having the beneficial interest in the stock.   This was a liberal and broad construction, adopted with a view to the establishment of rights acquired and claimed in good faith.   But there was no intention of declaring that the stockholders and the corporation would not be equally

bound by the ratification of those whom they had invested with the actual legal title to the stock. The latter are the persons authorized, under the statute, to act in the matter, although, in favor of parties claiming under the corporate conveyance, the courts may look behind the apparent ownership and sustain a ratification made by the beneficial owners.

It follows, from these views, that the findings against the validity of the mortgage or deed of trust are not sustained by the evidence. These findings furnish support for the conclusions that the cross-complainants are not entitled to a foreclosure, and that they are entitled to a money judgment for the amount actually advanced. If the mortgage be valid, the judgment must direct a sale for the amount of the debentures and the charges secured.

The decree must, therefore, so far as it embodies these conclusions, be reversed, as must the order denying the cross-complainants' motion for a new trial. It is urged that, instead of awarding a new trial, this court should direct the court below to enter a decree of foreclosure on the findings made. This claim is put upon the ground that, regardless of the alleged want of ratification of the mortgage, and its consequent invalidity, the corporation is estopped, under the facts found, to deny the binding effect of its attempted act, under which it received and has retained large sums. If the mortgage in fact lacked the assent of the requisite number of stockholders, we think the doctrine of estoppel cannot be applied so as to give the instrument validity. The statute of 1880 makes the stockholders "a component part of the power to make a mortgage effective." (*Curtin* v. *Salmon River etc. Co.* 130 Cal. 345, 351, [80 Am. St. Rep. 132, 62 Pac. 552, 555].) If the directors could, without the assent of the stockholders, so act as to bind the corporation in matters in which such assent is made necessary, the purpose of the statute, i. e. the protection of stockholders, would be nullified. We do not say that there may not be circumstances under which the stockholders could be held estopped to rely on the want of ratification, but merely that such estoppel cannot be predicated upon the acts of the corporation or the directors alone. The finding upon which appellants rely relates solely to the conduct of the corporation.

A further ground is urged by cross-complainants for directing a judgment in their favor, to wit, that the pleadings admit

that Hodson was the record holder of more than two thirds of the stock and that he did acts amounting to a ratification of the mortgage. It would consume too much space to go into elaborate analysis of the pleadings. Suffice to say that we think the answers to the cross-complaint were clearly intended to raise issues on these points and that an unduly strict construction would be required to justify an order of judgment based upon the theory that there were no such issues. Nor do we think the findings on this point such as to justify a judgment of foreclosure.

The respondents suggest, as a ground for upholding the judgment in as far as it denies foreclosure, the point that the mortgage should be held invalid for the reason that it was executed to Hodson as one of the trustees and that Hodson himself was a director whose vote was necessary to authorize the execution of the mortgage. A sufficient answer to the point is that this defense was not within the issues. All of the pleadings in effect admitted the authorization and making of the deed of trust and based their objections to its validity solely on the ground that it did not have the ratification of the stockholders as required by the statute of 1880.

The third appeal (No. 1764) may be briefly disposed of. That is the appeal of the British corporation and of Van Ee from that part of the judgment whereby the cross-complainants recover from the British corporation the amount of the advances made upon the faith of the debentures. It will be unnecessary to refer specifically to the grounds upon which this appeal is based. As we have shown in discussing the appeal of the cross-complainants (No. 1744) this part of the judgment must fall with the granting of a new trial upon the issues affecting the foreclosure of the mortgage.

Accordingly, the following orders will be entered upon the respective appeals.

In No. 1744: The portions of the judgment appealed from and the order denying a new trial are reversed.

In No. 1750: The portions of the judgment appealed from are affirmed.

In No. 1764: The portions of the judgment appealed from are reversed.

Shaw, J., Angellotti, J., Melvin, J., Henshaw, J., and Lorigan, J., concurred.